VIRGINIA M. McKENNEY, HENRY W. KURZ, PETER SHAW, EACH INDIVIDUALLY, AND CITY OF TRENTON, TOWNSHIP OF LAWRENCE, CITY OF SALEM AND BOROUGH OF WOOD-BINE, MUNICIPAL CORPORATIONS OF THE STATE OF NEW JERSEY, PLAINTIFFS-APPELLANTS, v. BRENDAN BYRNE, GOVERNOR OF NEW JERSEY; RICHARD C. LEONE, STATE TREASURER; SIDNEY GLASER, DIRECTOR OF THE DIVI-SION OF TAXATION; PATRICIA Q. SHEEHAN, COMMISSION-ER OF THE DEPARTMENT OF COMMUNITY AFFAIRS; JOHN F. LAEZZA, DIRECTOR OF THE DIVISION OF LOCAL GOVERNMENT SERVICES, EACH IN HIS OFFICIAL CAPACI-TY, AND TOWNSHIP OF EAST HANOVER, TOWNSHIP OF BRANCHBURG, BOROUGH OF SAYREVILLE, CITY OF LIN-DEN, TOWNSHIP OF LOWER ALLOWAYS CREEK, TOWN OF KEARNY, TOWNSHIP OF LEBANON, TOWNSHIP OF BLAIRS-TOWN, BOROUGH OF RIDGEFIELD, TOWNSHIP OF HOL-LAND, TOWNSHIP OF HAMILTON, CITY OF JERSEY CITY, TOWNSHIP OF LACEY, TOWNSHIP OF WOODBRIDGE, CITY OF BURLINGTON, BOROUGH OF WALDWICK, TOWNSHIP OF WINSLOW AND CITY OF SOUTH AMBOY, MUNICIPAL COR-PORATIONS OF THE STATE OF NEW JERSEY, DEFEND-ANTS-RESPONDENTS.

Argued November 26, 1979—Decided March 10, 1980.

*I. Leo Motiuk* argued the cause for appellants (*Schaff, Motiuk & Hornby,* attorneys; *Richard M. Conley,* of counsel and on the brief).

*Harry Haushalter,* Deputy Attorney General, argued the cause for respondents, Brendan Byrne, Governor of New Jersey, *et al.* (*John J. Degnan,* Attorney General of New Jersey, attorney; *Stephen Skillman,* Assistant Attorney General, of counsel).

*William E. Andersen* argued the cause for respondent Township of Branchburg (*Woolson, Guterl, Sutphen & Anderson,* attorneys; *William E. Andersen* and *Mark S. Anderson,* on the brief).

*Charles V. O'Connell* appeared on behalf of the Township of Blairstown.

*Joseph R. Mariniello* appeared on behalf of the Borough of Ridgefield.

*Richard Dieterly* appeared on behalf of the Township of Holland (*Gebhardt & Kiefer,* attorneys).

*Garrett M. Heher* appeared on behalf of the Township of Lower Alloways Creek (*Smith, Stratton, Wise & Heher,* attorneys).

*Alan J. Karcher* appeared on behalf of the Borough of Sayreville (*Karcher, Reavey & Karcher,* attorneys).

*Samuel V. Convery, Jr.* appeared on behalf of the City of South Amboy (*Convery & Convery,* attorneys; *James B. Convery,* on the brief).

*Arthur W. Burgess,* Director of Law, appeared on behalf of the Township of Woodbridge (*Arthur W. Burgess,* attorney; *Paul E. Strapp,* on the brief).

*Wesley L. Lance* appeared on behalf of the Township of Lebanon.

*David C. Paterson* submitted a letter in lieu of a brief on behalf of the Township of Winslow (*Maressa & Wade,* attorneys).

*W. Cary Edwards, Jr.* submitted a letter in lieu of a brief on behalf of the Township of East Hanover (*Edwards & Gullo*, attorneys).

*Jerome Krueger*, City Attorney, submitted a letter in lieu of a brief on behalf of the City of Linden.

*Norman A. Doyle, Jr.* submitted a letter in lieu of a brief on behalf of the Town of Kearny (*Doyle & Brady*, attorneys).

*Renee C. Ricciardelli*, Township Attorney, submitted a letter in lieu of a brief on behalf of the Township of Hamilton.

No appearance was made on behalf of respondents City of Burlington, City of Jersey City, Township of Lacey and Borough of Waldwick.

The opinion of the Court was delivered by

SCHREIBER, J.

Virginia McKenney, Henry Kurz and Peter Shaw filed a complaint in lieu of prerogative writ attacking the constitutionality of *N.J.S.A.* 54:30A–61 apportioning to municipalities proceeds of a tax imposed on gross receipts of certain public utilities.[1] The named defendants are the Governor, State Treasurer, Director of the Division of Taxation, Commissioner of the Department of Community Affairs and the Director of the Division of Local Government Services. Twenty-two municipalities were permitted to intervene, some on behalf of plaintiffs and others on behalf of defendants.

---

[1] McKenney and Kurz lived in Roselle Park, N.J. and Shaw resided in East Amwell Township, N.J. and owned realty in Delaware Township, N.J.

After considering cross-motions for summary judgment, the trial court held the statute constitutional and dismissed the complaint. 147 *N.J.Super.* 158 (Law Div.1976). The individual plaintiffs, City of Trenton, Township of Lawrence (Mercer County), City of Salem and Borough of Woodbine appealed. The Appellate Division affirmed essentially for the reasons given by the trial court. 160 *N.J.Super.* 303 (App.Div.1978). Plaintiffs then appealed as of right to this Court. *R.* 2:2–1(a).

The challenged provision is part of a legislative scheme, *N.J.S.A.* 54:30A–49 *et seq.*, taxing principally gas, electric and water public utilities. The stated purposes of the Act are "to provide a complete scheme and method for the taxation of [the enumerated classes of public utilities] using or occupying public streets . . . or other public places" and to apportion "certain of such taxes among municipalities upon the fixed standards" set forth. *N.J.S.A.* 54:30A–49. However, excluded from the taxing plan are land and buildings, *N.J.S.A.* 54:30A–50(b) and *N.J.S.A.* 54:30A–52, electric and gas appliances held for resale, and by-products of gas manufacture held for resale. *N.J.S.A.* 54:30A–52. These excluded items are to be assessed and taxed at local rates in the same manner as other comparable property. On the other hand, these public utility companies are exempt from the corporate income tax, and the sales tax on business machinery. *N.J.S.A.* 54:30A–51.

There are four separate taxing components in the Act: (1) a tax of generally 5% of a fraction of the utility's gross receipts, the fraction being the ratio of the length of lines or mains in public streets or places excluding service connections to the total length of lines or mains excluding service connections, *N.J.S.A.* 54:30A–54(a); (2) a tax of 7½% of gross receipts from business "over, on, in, through or from its lines or mains," *N.J.S.A.* 54:30A–54(b); (3) a tax of generally 0.625% calculated on the same fraction of gross receipts as computed under (1) above,

N.J.S.A. 54:30A–54(c)(1); and (4) a tax of 0.9375% calculated in the same manner as (2) above, N.J.S.A. 54:30A–54(c)(2). Only the distribution of the funds derived from the 7½% gross receipts tax is challenged.[2]

The proceeds from that tax (item (2) above) are apportioned among municipalities based on the ratio of "scheduled property" of the public utility located within the municipality to the total value of "scheduled property" of the public utility within the State. N.J.S.A. 54:30A–61. "Scheduled property" is by definition limited to specified items, each measurable by a prescribed unit value. N.J.S.A. 54:30A–50(d). In the case of gas companies, it includes gas manufacturing plants, valued at $185 per 1,000 cubic feet of daily manufacturing capacity; gas holders, valued at $80 per 1,000 cubic feet of capacity, and mains, valued at prices depending on size and material. N.J.S.A. 54:30A–58. As for the electric industry scheduled property consists mainly of generating stations, valued at $45 per kilowatt of generating capacity; substations and switching stations, valued at $14 and $5 per kilovolt-ampere of capacity; towers, valued at $2,530 each; poles generally at $27 each; conductors and conduits valued at various per-foot charges depending upon size and material, and street lights at $11 each. N.J.S.A. 54:30A–58. The State Tax Commissioner annually computes and certifies the amount due to each municipality in which scheduled property is located. N.J.S.A. 54:30A–61. The public utility thereafter pays that amount directly to the municipality. N.J.S.A. 54:30A–62.

Plaintiffs persuasively argue that this method of allocation disserves the public interest. Municipalities with small populations, which have a nuclear plant or other generating station within their borders, have been receiving disproportionately

---

[2]To avoid confusion, "gross receipts tax" will hereafter refer to the tax in item (2) only. See Atlantic City Transportation Co. v. Director, Div. of Taxation, 12 N.J. 130, 136 (1953).

large revenues from the tax on gross receipts derived in large measure from customers in other communities. For example, in 1978 the municipalities involved in this case received dramatically disparate per capita revenues from the gross receipts tax:

| Plaintiff-Municipalities and Municipalities of Individual Plaintiffs | 1978 Gross Receipts [a] | 1978 Est. Population [b] | Per Capita Revenue |
|---|---|---|---|
| Woodbine Bor. | $ 13,049 | 2,807 | $ 4.65 |
| Roselle Pk. Bor. | 123,831 | 13,299 | 9.31 |
| Delaware Tp. | 49,179 | 3,693 | 13.32 |
| Trenton | 1,406,237 | 96,359 | 14.59 |
| E. Amwell Tp. | 52,486 | 3,171 | 16.55 |
| Salem | 168,884 | 7,039 | 23.99 |
| Lawrence Tp. (Mercer) | 625,504 | 20,923 | 29.90 |
| Plaintiff Total | $ 2,439,170 | 147,291 | $ 16.56 |
| **Defendant-Municipalities** | | | |
| Lower Alloways Ck. Tp. | $ 7,969,850 | 1,441 | $5,530.78 |
| Blairstown Tp. | 2,984,553 | 3,383 | 882.22 |
| Holland Tp. | 3,655,656 | 4,319 | 846.41 |
| Burlington | 6,459,012 | 11,630 | 555.38 |
| Ridgefield Bor. | 5,596,922 | 10,460 | 535.08 |
| Lacey Tp. | 4,054,373 | 13,267 | 305.60 |
| Linden | 11,362,727 | 39,392 | 288.45 |
| Lebanon Tp. | 1,465,829 | 5,214 | 281.13 |
| S. Amboy | 2,215,784 | 8,822 | 251.17 |
| Kearny | 8,597,084 | 36,410 | 236.12 |
| Branchburg Tp. | 1,249,658 | 6,801 | 183.75 |
| Sayreville Bor. | 4,821,021 | 31,696 | 152.10 |
| E. Hanover Tp. | 997,811 | 9,429 | 105.82 |
| Woodbridge Tp. | 8,914,641 | 95,180 | 93.66 |
| Winslow Tp. | 1,693,135 | 18,554 | 91.25 |
| Hamilton Tp. (Mercer) | 7,246,896 | 83,067 | 87.24 |
| Waldwick Bor. | 897,925 | 11,679 | 76.88 |
| Jersey City | 14,569,542 | 227,521 | 64.04 |
| Defendant Total | $ 94,752,419 | 618,265 | $ 153.25 |
| Statewide Total | $238,980,507 | 7,349,000 | $ 32.52 |

[a] 1978 Division of Taxation Annual Report 240–266.
[b] Office of Demographic and Economic Anayisis, Dep't of Labor and Industry, Population Estimates for New Jersey, July 1978 (1979).

These defendant municipalities, having a combined estimated population of 618,265 or about 8.4% of the estimated total of 7,349,000, received $94,752,419 in 1978 or about 39.6% of the total $238,980,507 apportioned statewide. The per capita revenues of each of these municipalities far exceed the statewide average of $32.52 per capita.

The inequity in the distribution is aggravated by the peripheral effect of other laws. The federal government credits gross receipts revenues in computing local tax effort so that these municipalities are entitled to an increased share of federal funds. See 31 *U.S.C.* §§ 1227(b) & 1228(e). Further, there is an anomaly resulting from the failure to consider revenues received from the gross receipts tax in computing eligibility for state aid to education. See *N.J.S.A.* 18A:7A–17 *et seq.* Thus, a municipality that has no local school tax because of its share of gross receipts can receive state education aid. Additionally, the State's 5% CAP law on expenditures does not apply in Lower Alloways Creek, for example, because its municipal tax rate is less than 10 cents per $100 of assessed valuation. See *N.J.S.A.* 40A:4–45.2. Moreover, as utilities close obsolete plants located in urban areas and construct new facilities elsewhere, the inequity as well as the inequality of the allocation scheme will become even more pronounced.

Plaintiffs also emphasize that the amount being paid to municipalities which have substantial scheduled property within their borders is continuing to increase even though the scheduled property located in a particular community remains constant. This incongruous result is due to inflation and the increased price of oil. As a regulated industry, the utilities have been able to pass on to the consumer these increased costs in the form of higher rates. Electric and gas company tariffs contain fuel adjustment clauses which permit rate increases predicated solely upon the increased cost of oil or natural gas without generating additional net income. See, *e. g., In re Revision of*

*Rates by Redi-Flo Corp.*, 76 *N.J.* 21 (1978). These higher rates result in more revenues and in turn create larger gross receipts taxes. At least to this extent higher rates and consequently taxes subject to apportionment are not related to any increase in value in the scheduled property. Accordingly, the municipalities which have been receiving substantial funds from the gross receipts tax have been the beneficiaries of larger amounts unrelated to productivity.

The burden of the gross receipts tax is ultimately borne by the utilities' customers throughout the State. It thus amounts to a sales tax derived almost entirely from the sale of electricity and gas. However, under the current scheme, residents of certain small municipalities enjoy low local taxes and budget surpluses. Other financially strapped municipalities with substantially larger populations have been indirectly paying a far larger part of the tax and yet have been compelled to lay off public employees, cut back essential services, and raise already high local tax rates. This inequity which plaintiffs alleged has been recognized by Governor Byrne who commented in his Annual Message to the Legislature on January 9, 1979:

> The utility gross receipts and franchise tax distribution formula must be reworked to return funds to municipalities in a more equitable way. [1978 Annual Report of the Governor 2]

Plaintiffs frankly state that "it is only the Legislature which may change the apportionment of the public utility gross receipts tax," and that the "Legislature has not acted to modify this formula over the years. . . ."[3] Accordingly, they "have been impelled to seek a resolution of this problem in the

---

**3.** The Legislature recently has considered numerous bills addressing the apportionment scheme challenged here. See, *e. g.,*

| | |
|---|---|
| S. 891 | Introduced January 24, 1980 |
| S. 794, 795 | Introduced January 8, 1980 |
| S. 797 | Introduced January 8, 1980 |
| S. 371, 372 | Prefiled in 1980 Session |
| S. 3487, 3488 | Introduced December 10, 1979 |

courts." They have phrased the legal issue in terms of whether the Legislature may structure a tax system so that a few municipalities receive virtually unlimited amounts of revenues from state taxes while others receive a relative pittance from the same source.

At the outset it should be emphasized that no one, including plaintiffs, quarrels with the validity of the imposition of the tax. See *Foosaner v. Director, Div. of Taxation*, 58 *N.J.* 57, 62 (1971). The heart of the complaint is the alleged infirmity in *N.J.S.A.* 54:30A–61 which directs the apportionment of the 7½% of gross receipts.

The threshold question, then, is what limitations govern the Legislature's decision to distribute funds created by a state-imposed tax. Expenditures of funds by the Legislature reflect legislative judgment in the exercise of its inherent constitutional function. The judiciary should not review the wisdom of such a legislative decision. Chief Justice Weintraub in *A & B Auto Stores of Jones St., Inc. v. Newark*, 59 *N.J.* 5 (1971), reminded us that:

> It is not for the judiciary to override legislative decisions because their policy may be unappealing. The only question for us is whether the statute is so devoid of arguable merit as to exceed the constitutional restraints upon the Legislature. [*Id.* at 19]

See also *N. J. Ass'n on Correction v. Lan*, 80 *N.J.* 199, 211 (1979). Some constitutional restrictions are clear. The State may not, for example, appropriate money to any society, association or corporation for private purposes. *N.J.Const.* (1947), Art. VIII, § III, par. 3. See, *e. g., Roe v. Kervick*, 42 *N.J.* 191 (1964). The State must use funds derived from casino gambling for senior citizens and disabled residents. *N.J.Const.* (1947), Art. IV,

---

S. 3474, 3475    Introduced November 29, 1979
S. 1515          Introduced January 9, 1979

S.794, as amended, passed in the State Senate on January 29, 1980 and was referred to the Assembly.

§ VII, par. 2(D). We have not found, nor have the parties brought to our attention, any constitutional limitation expressly governing the distribution of funds raised by taxes on a public utility's gross receipts.

Recognizing the need to find a constitutional provision, plaintiffs have relied upon the federal and state equal protection clauses, and upon two provisions of the New Jersey Constitution (1947), Art. IV, § VII, par. 9(6) and 9(13), relating to special legislation. We find none of these provisions applicable. It is doubtful whether any of the municipalities may attack the legislation on these grounds.[4]

■   We find that the equal protection claims of the individual taxpayers do not warrant relief. When measuring legislation against the standards of the Equal Protection Clause of the Fourteenth Amendment, the United States Supreme Court has expressed a greater deference to classifications made by the states in the field of taxation. This principle evolved because:

> Traditionally classification has been a device for fitting tax programs to local needs and usages in order to achieve an equitable distribution of the tax burden. It has, because of this, been pointed out that in taxation, even more than in

---

[4]Whether a municipality has standing to raise these issues is questionable. It has been held it is not a "person" entitled to the benefit of the Equal Protection Clause of the Fourteenth Amendment. *Williams v. Mayor of Baltimore*, 289 *U.S.* 36, 53 *S.Ct.* 431, 77 *L.Ed.* 1015 (1933); *Newark v. New Jersey*, 262 *U.S.* 192, 43 *S.Ct.* 539, 67 *L.Ed.* 943 (1923). Furthermore, being a political subdivision and creature of the State, a municipality might not fall within the protective mantel of the cited state constitutional provisions. See *Glassboro Borough v. Byrne*, 141 *N.J.Super.* 19 (App.Div.1976), certif. den. 71 *N.J.* 518 (1976). As previously observed three individual taxpayers instituted this action. These plaintiffs claim that under a more equitable formula their municipalities would receive a larger amount of money and they would pay lower taxes. On this appeal defendants have not challenged plaintiffs' standing. In view of the absence of any such claim and the broad public interest involved, we assume that the taxpayers do have standing. See *Crescent Pk. Tenants Ass'n v. Realty Equities Corp.*, 58 *N.J.* 98 (1971).

other fields, legislatures possess the greatest freedom in classification. Since the members of a legislature necessarily enjoy a familiarity with local conditions which this Court cannot have, the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes. [*Madden v. Kentucky*, 309 *U.S.* 83, 88, 60 *S.Ct.* 406, 408, 84 *L.Ed.* 590, 593 (1940); footnotes omitted]

There being no fundamental right or suspect category involved, the crucial constitutional issue is whether there is any reasonably conceivable state of facts which would afford a rational basis for the classification. *Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp.*, 80 *N.J.* 6, 39–40 (1976), *cert.* den. *sub nom. Feldman v. Weymouth Tp.*, 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.2d* 373 (1977).

██ The Supreme Court has also cautioned that some discriminatory impact and some imperfections in the groupings or categories will not invalidate the classification. *Dandridge v. Williams*, 397 *U.S.* 471, 485, 90 *S.Ct.* 1153, 1161, 25 *L.Ed.2d* 491, 501–502 (1970). In *San Antonio Independent School Dist. v. Rodriguez*, 411 *U.S.* 1, 93 *S.Ct.* 1278, 36 *L.Ed.2d* 16 (1973), the Court, upholding the constitutionality of a Texas statutory financing scheme, wrote:

No scheme of taxation, whether the tax is imposed on property, income, or purchases of goods and services, has yet been devised which is free of all discriminatory impact. In such a complex arena in which no perfect alternatives exist, the Court does well not to impose too rigorous a standard of scrutiny lest all local fiscal schemes become subjects of criticism under the Equal Protection Clause. [411 *U.S.* at 41, 93 *S.Ct.* at 1301, 36 *L.Ed.2d* at 48; footnote omitted]

██ A concept of equal protection is implicit in Art. I, par. 1 of the 1947 New Jersey Constitution which declares and protects the natural and unalienable rights of enjoying life and liberty, of acquiring and possessing property and of pursuing and obtaining safety and happiness. *Peper v. Princeton Univ. Bd. of Trustees*, 77 *N.J.* 55, 79 (1978); *Washington Nat'l Ins. Co. v. Bd. of Review of N. J. Unemployment Compensation Comm'n*, 1 *N.J.*

545, 554 (1949). The burden of mounting a successful challenge on equal protection grounds under the state Constitution in view of the circumstances here is no different from that which prevails under the federal Constitution. Although the sovereign power reposing in the people is exercisable by the Legislature, the exercise of that power must not violate the right to equal protection which the people have included in the Constitution. See *State v. Saunders*, 75 *N.J.* 200, 225–226 (1977) (Schreiber, J., concurring). We must consider the "apparent public justification" of the statute to "decide whether the State action is arbitrary." *Robinson v. Cahill*, 62 *N.J.* 473, 492 (1973) *cert.* den. *sub nom. Dickey v. Robinson*, 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.* 2d 219 (1973). Put another way, is the distributive scheme irrational or is it supportable on a conceivable rational basis?

■ Applying all the foregoing principles, we are constrained to hold that the statute does not violate the equal protection provisions of the federal or state constitutions. Plaintiffs' equal protection argument is premised on how the distribution by the State of gross receipts tax revenues affects municipal tax rates. Plaintiffs do not assert that they have been denied any essential services, but only that the tax burden is made disproportionate by the State's largesse to certain municipalities. However, the apportionment ratio is predicated on the same standards for all municipalities. Thus, every municipality having the identical scheduled property of a particular public utility will receive the same amount of funds. Furthermore, justification exists for classifying municipalities on the basis of the amounts of scheduled property within their borders.

When initially enacted in 1919 the apportionment section of the gross receipts tax was expressly predicated, at least in part, on substitution of the municipality's right to tax a public utility's property. *L.*1919, *c.* 25, § 1. Until 1938 the pertinent statutes continued to express the thought that the gross receipts

tax was "in lieu of all . . . local taxation of all personal property . . . ." *R.S.* 54:32–1. In 1938 the Act was amended and stated that the tax was "in lieu of all other taxes . . . ." *L.*1938, *c.* 8, § 5. In 1940 this language was omitted. *L.*1940, *c.*5, § 3. Thus, justification for the apportionment section of the statute is no longer limited or restricted to the stated purpose provided in the original law in 1919, at least in the context of an equal protection attack.

We may not assume that the intent of the Legislature to provide revenues in lieu of local personal property taxes was the sole purpose of the Legislature, belying any other legitimate aim to which the allocation scheme bears a rational relation. Although the Legislature may have stated only one purpose, this does not foreclose the possibility that it had in mind other related reasons for its action. This is particularly apt when the originally stated purpose is omitted upon reenactment of the statute. Under such circumstances we should not ignore alternative rationales. "It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 *U.S.* 483, 488, 75 *S.Ct.* 461, 464, 99 *L.Ed.* 563, 572 (1955).

■ There are additional conceivable rationales for the allocation scheme. It is contended that the statute compensates those municipalities where major utility electric and gas plants are situated. A real estate appraiser in an uncontradicted affidavit produced on the motion for summary judgment stated that the value of land is lowered if located near an electric switching station. The reasons he ascribed were that: (a) people fear a danger of possible accidents resulting from a mishap in the station; (b) a station mars the landscape and tends to be an eyesore; and (c) the general public thinks the station will interfere with radio and television reception. Further, increased fire and police protection may be necessary because of the

existence within a municipality of utility installations such as gas plants or holders, or electric generating, including nuclear, facilities. The presence of these facilities may generate other environmental problems such as heavy traffic, road wear, noise and air pollution. All these elements support the concept that the presence of substantial amounts of scheduled property within a municipality's borders may justify some measure of greater compensation. Although there appears to be overcompensation, we are bound, as a matter of constitutional law, to assume any reasonably conceivable state of facts not foreclosed by the record before us which would sustain the Legislature's judgment; we cannot hold on this record that the relationship, involving a broad legislative judgment, is irrational.

■ When the Court previously considered the impact of the distribution of the gross receipts tax revenues, it took an absolutist position.[5] In *Hoboken v. Martin*, 123 *N.J.L.* 442, 445 (E. & A. 1939), the Court of Errors and Appeals declared, albeit in

---

[5]Some intervenor-defendants have urged that plaintiffs' challenge of the tax apportionment scheme presents a non-justiciable political question because (a) the case involves issues within the Legislature's absolute discretion and (b) there is a lack of a judicial standard for resolving the issues. We obviously disagree. Notwithstanding possible implications to the contrary in *Hoboken v. Martin*, 123 *N.J.L.* 442, 445 (E. & A. 1939), and *Jersey City v. Martin*, 126 *N.J.L.* 353, 362–363 (E. & A. 1941), this case does not raise issues wholly beyond the purview of this Court.

We noted above that the Legislature's discretion to apportion tax income was governed by certain specific constitutional restraints, as well as by more general provisions, upon which plaintiffs rely, assuring equal protection and limiting the passage of special laws. "Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts . . . to determine, if on the particular facts they must, that a discrimination reflects *no* policy, but simply arbitrary and capricious action." *Baker v. Carr*, 369 *U.S.* 186, 226, 82 *S.Ct.* 691, 714, 7 *L.Ed.2d* 663, 691 (1962). See also *Passaic Cty. Bar Ass'n v. Hughes*, 108 *N.J.Super.* 161 (Ch.Div.1969) (per Mountain, J. S. C.).

dictum, that the Legislature "may apportion and distribute" tax revenues derived from gross receipts of public utilities "as it may see fit and determine . . . ." The same result was reiterated in *Jersey City v. Martin*, 126 *N.J.L.* 353 (E. & A. 1941), where the Court of Errors and Appeals, in rejecting an attack on a different aspect of the same scheme involved here, wrote:

> The constitution lays no restriction upon the inherent power of the legislature to provide for the disposition of such taxes by such formula as it may choose to effectuate its will. [*Id.* at 362]
>
> . . . [The distributive scheme] is a matter exclusively within the province of the law-making body, wholly free of constitutional restraint. [*Id.* at 363]

■ Plaintiffs' contention that the allocation provision, *N.J. S.A.* 54:30A-61, is a special or local law violative of the New Jersey Constitution (1947), Art. IV, § VII, par. 9(6) and 9(13), because it relates to taxation and regulates the internal affairs of municipalities, is without merit. The statute is not a special or local law because the classification is constitutionally reasonable, all within the group have characteristics which are sufficiently identifiable so that they constitute a class, and none has been excluded which should have been encompassed within the classification. See *Alfred Vail Mutual Ass'n v. New Shrewsbury Borough*, 58 *N.J.* 40, 48-49 (1971).

The judgment is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*For reversal*—None.