604 A.2d 216

TOWNSHIP OF NORTH BERGEN, PLAINTIFF, v. THE BOROUGH OF TETERBORO, ET AL., DEFENDANTS.

TOWN OF SECAUCUS, PLAINTIFF, v. HACKENSACK MEADOWLANDS DEVELOPMENT COMMISSION, ET AL., DEFENDANTS.

Superior Court of New Jersey
Law Division Hudson County

Decided May 1, 1991.

*Frances Holland* for plaintiff Secaucus (*Holland & Holland*, attorneys) and

*Bernard Schenkler* for plaintiff Secaucus (*Ravin, Sarasohn, Cook, Baumgarten, Fisch & Baime*, attorneys).

*Alan Karcher* and *Ronald Gordon* for plaintiff North Bergen (*Karcher, McDonnell, Rainone & Gordon*, attorneys).

*Bruce L. Humphreys* for defendant Ridgefield (*Contant, Schuber, Scherby & Atkins*, attorneys).

*Michael E. Kahn* for defendant Hackensack Meadowlands Development Commission (*Robert J. DelTufo*, Attorney General of New Jersey).

*Norman A. Doyle* for defendant Kearny (*Doyle & Brady,* attorneys).

*George Savino* for defendant Lyndhurst.

*Paul S. Barbire* for defendant Moonachie (*Presto & Barbire,* attorneys).

*Peter J. Scandariato* for defendant North Arlington.

*David B. Bole* for defendant Teterboro (*Winnie, Dooley & Bole,* attorneys).

*John J. Langan, Jr.* for defendants Carlstadt, South Hackensack and Little Ferry (*DeCotiis & Pinto,* attorneys).

CRABTREE, J.T.C. t/a

This case involves a challenge to the intermunicipal tax-sharing formula embodied in the Hackensack Meadowlands Reclamation and Development Act, *L.*1968, *c.* 404. The Act as amended appears as *N.J.S.A.* 13:17–1, *et seq.* and the tax-sharing formula is found in Article 9, *N.J.S.A.* 13:17–60 to –76. The purpose of the legislation is set forth in *N.J.S.A.* 13:17–1, which provides:

It is hereby declared that there are approximately 21,000 acres of salt water swamps, meadows and marshes which are commonly known as meadowlands, in the lower Hackensack river basin; that extensive portions of this area have so far resisted comprehensive development because of their low elevation, exposure to tidal waters, unfavorable soil composition, and, in some instances, their distribution among many municipalities; that this land acreage is a land resource of incalculable opportunity for new jobs, homes and recreational sites, which may be lost to the State through piecemeal reclamation and unplanned development; that much of this acreage may be subject to redevelopment under section 3, Article VIII, of the State Constitution; that the orderly, comprehensive development of these areas, due to their strategic location in the heart of a vast metropolitan area with urgent needs for more space for industrial, commercial, residential, and public recreational and other uses, can no longer be deferred; that insofar as meadowlands are State-owned lands they are an asset of the fund for the support of free public schools whose integrity may not be impaired; that while the State, in the name of the people, has an obligation to assert its interests in meadowlands that are clearly State-owned, it has an equal obligation to establish a framework within which private owners may assert their interests and take title to meadowlands that are privately-owned; that these areas need special protection from air and water pollution and specia‘

arrangements for the provision of facilities for the disposal of solid waste; that the necessity to consider the ecological factors constituting the environment of the meadowlands and the need to preserve the delicate balance of nature must be recognized to avoid any artificially imposed development that would adversely affect not only this area but the entire State; that it is the purpose of this act to meet the aforementioned needs and accomplish the aforementioned objectives by providing for a commission transcending municipal boundaries and a committee representing municipal interests which will act in concert to reclaim, plan, develop and redevelop the Hackensack meadowlands; and to safeguard fully the interests of the fund for the support of free public schools, all to the extent and manner provided herein.

The boundaries of the Hackensack Meadowlands District are set forth in *N.J.S.A.* 13:17–4 and they embrace parts of 14 municipalities in Hudson and Bergen Counties.

The Act is administered by the Hackensack Meadowlands Development Commission (HMDC), created by *N.J.S.A.* 13:17–5. The powers of the HMDC, set forth in *N.J.S.A.* 13:17–6, include the power to purchase or lease lands, including land under water or riparian lands, the power to adopt a master plan for the physical development of all lands within the district, and the power, either through contracts with developers or by its own employees, to undertake improvement projects in aid of reclamation, development or redevelopment of land within the district. The HMDC is specifically directed by *N.J.S.A.* 13:17–9 to adopt a master plan for the physical development of all lands in the district. By the terms of *N.J.S.A.* 13:17–11 the master plan may provide for residential, commercial, industrial, agricultural and park uses; it may also provide for transportation, streets, parking, freight facilities, airports, harbors, channels, wharves and other like matters. The plan may also address housing, residential standards, redevelopment, rehabilitation and conservation.

The plan may also include codes and standards covering land use, comprehensive zoning, subdivisions, building construction and design, housing and the control of air and water pollution and solid waste disposal. Significantly, no constituent municipality may enact or enforce any code inconsistent with the

HMDC master plan in so far as it pertains to land within the district.

Article 9, the subject matter of this litigation, deals with intermunicipal tax sharing, the program whereby the financial benefits and liabilities of meadowlands development are shared equitably among the constituent municipalities. The statutory implementation of the tax-sharing program is embodied in *N.J.S.A.* 13:17-60 to -76. The linchpin of the program is the intermunicipal account, established by *N.J.S.A.* 13:17-66. Through a 25-step formula, HMDC calculates the annual amount payable to the account by each constituent municipality and the annual amount due to each municipality from the account.

Plaintiffs, the Town of Secaucus and the Township of North Bergen, are the most substantial net contributors to the intermunicipal account, *i.e.*, their payments to the account significantly exceed their credits from the account. Five other municipalities also make net payments but not on the scale of the payments made by plaintiffs. The remaining seven municipalities, all defendants in this action, as well as the HMDC, are net recipients.

The purpose of intermunicipal tax sharing and its role in the Act's implementation are set forth in *N.J.S.A.* 13:17-60:

(a) The Legislature hereby finds and declares that a vital component of any comprehensive plan for the development of the meadowland district, is a program whereby the financial benefits and liabilities of each constituent municipality, are clearly established and equitably distributed. Article 9 of this act provides for such a program, by the creation of an intermunicipal account, and specifically provides that each constituent municipality will be guaranteed, in perpetuity, against loss of its present existing tax ratable values within the meadowland district occurring by reason of the acquisition of taxable real property, through purchase, eminent domain or gift, by a governmental body or agency to be used for a public purpose, to the extent that such loss of existing tax ratable values is not offset by increased true value of the remaining taxable real property within the district, and will equitably share in the new financial benefits and new costs resulting from the development of the meadowland district as a whole. This article further provides that the Hackensack Meadowlands Development Commission shall not be able to receive any funds from the intermunicipal account.

(b) The Hackensack Meadowlands Development Commission shall, in 1974, and every year thereafter, submit a report to the Meadowlands Municipal Committee and the Legislature, relating to the operations of the intermunicipal account in the prior year, and shall recommend, when it deems necessary, such amendments to this article as it may deem necessary, to carry out the legislative intent herein stated.

The intermunicipal account established by *N.J.S.A.* 13:17–66 to reallocate municipal tax revenues among the constituent municipalities is the focus of the tax-sharing formula. Each municipality's affirmative obligation to pay is computed according to the formula set out in *N.J.S.A.* 13:17–67(b). A municipality's payment obligation is subtracted from the sum of all payments due the municipality to determine the "meadowlands adjustment payment" for that municipality. *N.J.S.A.* 13:17–74(a). If the sum of payments due to a municipality exceeds its affirmative obligation, payment is made to that municipality from the intermunicipal account and the meadowlands adjustment appears in the municipality budget under "miscellaneous revenues anticipated." *N.J.S.A.* 13:17–74(b). If, on the other hand, a municipality's affirmative obligation exceeds payments due to it, then the municipality must enter the amount of such excess as a special line item appropriation in its budget and pay the excess to the intermunicipal account in three installments. *N.J.S.A.* 13:17–74(c).

Each constituent municipality's payment obligation is determined by a formula involving four terms requiring definition:

(a) "Adjustment year"—the year in which obligations to, and payments from, the intermunicipal account are payable. *N.J.S.A.* 13:17–61(a).

(b) "Base year"—calendar year 1970. *N.J.S.A.* 13:17–61(e).

(c) "Comparison year"—the second calendar year preceding the adjustment year. *N.J.S.A.* 13:17–61(f).

(d) "Apportionment rate"—the total property tax levied by a municipality in the comparison year for local, school, veteran and senior citizen purposes divided by the aggregate true value (assessed value divided by the average assessment ratio promulgated for the municipality by the Director, Division of Taxation pursuant to *N.J.S.A.* 54:1–35.1) of all taxable real property other than Class II railroad property located in the municipality both within and without the meadowlands district. *N.J.S.A.* 13:17–61(g).

Except for the compounding effect of the meadowlands adjustment payment, to be addressed below, each constituent municipality's annual apportionment rate is based essentially upon those expenses, other than the cost of county government, which tax rates are designed to cover.

Each municipality's obligation to pay to the intermunicipal account is based upon the application of its apportionment rate for the comparison year to the excess of the aggregate true value of taxable real property in the district portion of municipality in the comparison year over the aggregate true value of such property in the base year. *N.J.S.A.* 13:17-67. In 1973, the first adjustment year, each constituent municipality's obligation to the account was 10% of the product of the apportionment rate times such excess, increasing by 4% increments each year until 1983 when the debit was 50%, where it remained until the adjustment year 1989. Finally, the total amount of tax sharing payment obligations is apportioned among the constituent municipalities in the same ratio as the number of meadowlands acres within each municipality bears to the total number of acres in the meadowlands district. *N.J.S.A.* 13:17-72(a). This is known as the apportionment payment. If a municipality's tax sharing obligation, computed in accordance with *N.J.S.A.* 13:17-67, exceeds the municipality's apportionment payment calculated pursuant to *N.J.S.A.* 13:17-72(a), the municipality is required to pay the difference to the intermunicipal account in three equal installments; if the apportionment payment exceeds the tax sharing obligation the difference is payable to the municipality by the intermunicipal account in three equal installments. *N.J.S.A.* 13:17-74.

It will thus be seen that the meadowlands adjustment payment for each municipality is a function of (a) the growth in ratables from 1970 to the comparison year, (b) the comparison year apportionment rate (*i.e.*, the effective tax rate adjusted to eliminate county taxes) and (c) the municipality's percentage share of the total meadowlands acreage.

Plaintiffs advance four contentions in support of their position that the tax-sharing provisions of Article 9 should be declared unconstitutional and meadowlands adjustment payments made by them must be refunded.

First, they claim that Article 9 violates Article VIII, Section 1 of the New Jersey Constitution in that it compels a general tax rate which is not for the use of the taxing district. Related to this contention is the argument that Article 9 improperly establishes an arbitrary basis for the allotment of tax receipts. Put differently, the taxing power is delegated to meet the cost of governing a municipality and allotment of tax receipts for any other purpose is illegal.

Secondly, plaintiffs argue that the compounding effect is unconstitutional and lacks a reasonable relationship to Article 9's purpose. The compounding of which plaintiffs complain arises from the application of *N.J.S.A.* 13:17–74(c), which directs that the excess of the amount payable to the intermunicipal account over the credit to which the paying municipality is entitled under the tax-sharing formula shall be entered as a line item appropriation in the municipality's budget for the adjustment year. This action, in turn, increases the amount to be raised by taxation and thus impacts the tax rate for that year. The ultimate effect is to increase the amount payable to the intermunicipal account two years hence. The reverse is true if the meadowlands adjustment payment for a municipality in any adjustment year is greater than its tax-sharing obligation. The difference is reflected in the municipal budget category of "miscellaneous revenues anticipated." This reduces *pro tanto* the amount required to be raised by taxation, with a concomitant reduction in the tax rate for the adjustment year. The ultimate effect is to decrease the amount payable to the intermunicipal account two years hence.

Thirdly, plaintiffs urge that it is arbitrary to determine the aggregate true value of real property by dividing the aggregate assessments by the Director's ratio. Plaintiffs' argument ad-

dresses several alleged defects in the statutory methodology employed to measure growth in ratables. Plaintiffs point to the allegedly disparate characteristics of properties located within the meadowlands district compared to the generality of properties in the entire municipality; plaintiffs contend that the number of sales within the meadowlands provides an insufficient sales sampling to support the use of the Director's ratio as a means of measuring growth in ratables for tax sharing purposes. Plaintiffs argue that the Director's ratio produces a result which is not only mathematically inaccurate but which in its application is arbitrary and unreasonable in that it lacks a rational relationship to the attainment of the intended object of Article 9 of sharing the benefits of increased tax revenues of the constituent municipalities attributable to growth in ratables.

Finally, plaintiffs contend that, as a result of the superseding federal jurisdiction of the United States Army Corps of Engineers and the United States Environmental Protection Agency, the regulatory powers of the HMDC are no longer a determinative influence on wetlands development within the meadowlands. The consequence of this preemption by federal agencies, plaintiffs argue, is that the underlying legislative presumption for tax-sharing under Article 9 is rendered invalid and nugatory. *Cessante ratione legis, cessat et ipsa lex.* H. Broom, *A Selection of Legal Maxims* (7th ed. 1874) 159.

■ Resolution of the issues raised by plaintiff's contentions begins with a review of the prior judicial challenge to the tax-sharing formula of Article 9.

The constitutionality of Article 9 was attacked in four actions commenced in the Superior Court in 1968. The actions were consolidated and heard in the Superior Court, Chancery Division, which upheld the constitutionality of the Hackensack Meadowlands Reclamation and Development Act, *L.*1968, *c.* 404, in its entirety, including Article 9. *Meadowlands Regional Development Agency v. State,* 112 *N.J.Super.* 89, 270 *A.*2d 418

(Ch.Div.1970). The affected municipalities, which included Secaucus and North Bergen, appealed. The appeal was certified to the Supreme Court prior to hearing in the Appellate Division. The Supreme Court, with three dissents, affirmed. *Meadowlands Regional Redevelopment Agency v. State*, 63 *N.J.* 35, 304 *A.*2d 545 (1973), appeal dismissed 414 *U.S.* 991, 94 *S.Ct.* 343, 38 *L.Ed.*2d 230 (1973).

The municipalities alleged that the tax-sharing provisions (a) improperly delegated taxing power to the HMDC, (b) imposed taxes on the constituent municipalities for the benefit of the entire State or of regions outside constituent municipalities and provided an allotment of real property tax proceeds raised in some municipalities to other municipalities and (c) were arbitrary in their application to the constituent municipalities. 63 *N.J.* at 39, 304 *A.*2d 545.

While upholding the facial constitutionality of Article 9, the Court indicated that the legislation may be subject to future challenge for unconstitutionality as applied:

> The amended tax-sharing provisions present a mechanism for sharing tax benefits and burdens within the District which on its face appears to be rational and fair to constituent municipalities. Experience with the formula will undoubtedly put it in better perspective and establish if, where and how changes are needed to accomplish its purpose. In any event, should a constituent municipality demonstrate that the tax-sharing provisions as actually applied to it work an arbitrary result, it will have the right to secure judicial relief. All we now decide is that the amended provisions have not been shown to be arbitrary on their face. [63 *N.J.* at 44-45, 304 *A.*2d 545]

Plaintiff's first contention, *i.e.*, that Article 9 violates Article VIII, Section 1 of the New Jersey Constitution is a facial challenge to the statute's validity, not an attack upon its application. This issue was explicitly addressed by the Supreme Court, which affirmed the lower Court's ruling upholding the statute's constitutionality:

> Our dissenting colleague finds the amended tax-sharing provisions to be patently arbitrary in their application to constituent municipalities and therefore "unconstitutionally special" legislation. As heretofore noted, our conclusion is that the provisions appear to be rational and fair. We do not say that the present formula is mathematically perfect or that other and better alternatives

may not be adopted in the light of experience. *The objective sought is within the legislative power and the provisions in question appear reasonably calculated to achieve that objective.*

The dissent also finds that the same provisions compel constituent municipalities to raise by local taxation on real property situated therein moneys for the direct and exclusive use of other constituent municipalities, contrary to *N.J. Const.*, Art. VIII, § I, par. 1(a). This issue was discussed at length by the trial court and, as we have noted, we are in agreement with its conclusions that the tax-sharing provisions (the amendment changed only formula details and not the basic concept) imposed a cost of government upon the constituent municipalities in a manner which is "entirely consistent" with the above mentioned constitutional provision. [63 *N.J.* at 46, 304 *A.*2d 545]

The compounding effect, the challenge to which forms the basis for plaintiffs' second contention, is also apparent from the face of the legislation. *N.J.S.A.* 13:17–74 deals with the meadowlands adjustment payment and expressly provides for the budgetary consequences thereof. If a municipality's tax-sharing obligation is less than the credits to which it is entitled, the difference is reflected in the budget in the category of miscellaneous revenues. If the municipality's tax-sharing obligation exceeds its credits, the difference is entered in the budget as a special line item appropriation. Either way the meadowlands adjustment payment affects the apportionment rate, *i.e.*, the effective tax rate less the county portion. The compounding effect has its impact two years later when meadowlands adjustment payments are calculated in part on the basis of the tax rate established two years earlier. (The adjustment year becomes the comparison year two years later.) All this is palpable from an examination of the statute. Plaintiffs' challenge, then, is not to the application of the tax-sharing formula but to the formula itself as expressed in *N.J.S.A.* 13:17–67, *N.J.S.A.* 13:17–72 and, especially, *N.J.S.A.* 13:17–74.

Thus, the Supreme Court, in upholding the facial constitutionality of Article 9 has necessarily rejected challenges addressed to the language of the legislation, as distinguished from its application.

The doctrine of *res judicata* is squarely applicable. That doctrine bars not only claims raised in a previous proceeding

but also claims that could have been raised. *Nanavati v. Burdette Tomlin Memorial Hosp.*, 857 *F.*2d 96 (C.A.3rd 1988), cert. den. 489 *U.S.* 1078, 109 *S.Ct.* 1528, 103 *L.Ed.*2d 834 (1989); *Bates Marketing Associates, Inc. v. Lloyd's Electronics, Inc.*, 190 *N.J.Super.* 502, 464 *A.*2d 1142 (App.Div.1983), certif. granted 94 *N.J.* 583, 468 *A.*2d 222 (1983), appeal dismissed 97 *N.J.* 703, 483 *A.*2d 211 (1984). Constitutional issues, such as those raised in the instant case, are proper subjects for *res judicata* principles. *State v. American Can Co.*, 42 *N.J.* 32, 198 *A.*2d 753 (1964), cert. den. 379 *U.S.* 826, 85 *S.Ct.* 53, 13 *L.Ed.*2d 36 (1964).

The rule was succinctly stated in *Washington Tp. v. Gould*, 39 *N.J.* 527, 189 *A.*2d 697 (1963):

> ... It is well-settled that where a judgment of a court of competent jurisdiction directly determines a right, question or fact distinctly put in issue, such judgment estops the parties or their privies from thereafter relitigating the same issue in a subsequent proceeding between them, regardless of its nature or form. (citations omitted) ... [39 *N.J.* at 533, 189 *A.*2d 697]

The issues raised in plaintiffs' first two contentions have been resolved in a proceeding to which thy were parties. The issue of diversion of tax revenues in violation of Article VIII, *sec.* 1, *para.* 1 of the New Jersey Constitution was expressly passed upon by the Supreme Court in its 1973 decision; the issue of compounding was implicitly but necessarily resolved by the court's rejection of all facial challenges to the constitutionality of the Hackensack Meadowlands legislation, including the tax-sharing provisions of Article 9.

Accordingly, the claims of plaintiffs incorporated in their first and second contentions are rejected.[1]

■ Plaintiffs' third contention relating to the use of the Director's ratio in measuring the growth in property values appears to be a challenge to the application and operation of the

---

[1]The compounding effect has been eliminated for 1989 and later years by an amendment to *N.J.S.A.* 13:17–61(g).

tax-sharing formula which the Supreme Court left open in its 1973 decision 63 *N.J.* at 45, 304 *A.*2d 545.

The Director's ratio plays a critical role in the implementation of the tax-sharing formula and the effectuation of the legislative objective of sharing the burdens and benefits of development in the meadowlands district. The ratio purports to represent the relationship of assessments to market value as reflected in sales. Thus, the aggregate true value is determined by dividing the assessments of real property within the district boundaries in each constituent municipality by the average ratio promulgated by the Director for school aid purposes pursuant to *N.J.S.A.* 54:1–35.1 for each municipality. The aggregate true value of ratables within the district boundaries is calculated for the comparison year and the base year, and each municipality's apportionment rate is then applied to the difference. The result is the taxes attributable to the growth in ratables from the base year to the comparison year, 50% of which represents the municipality's tax-sharing obligation, *i.e.,* the payment to be made to the intermunicipal account before calculation of the apportionment payment to which the municipality is entitled. *N.J.S.A.* 13:17–67, –72, –74.

Plaintiffs' objections to the use of the ratio in calculating each municipalities' contribution to the intermunicipal account focus on the alleged mismatch between a ratio derived from sales of real property throughout the municipality and assessments of real property situated within district boundaries.

At this juncture an explanation of the derivation and functions of the Director's ratio will assist in placing plaintiff's objections in context.

The ratio is an expression of the percentage relationship between the assessment on a given property and its market value at a specific point in time, as reflected in sales occurring in the 12 months ended on June 30 immediately preceding such point in time. In any given municipality in any given year (at least prior to the recent decline in values) the bulk of the sales

from which the ratio is derived are of one to three family residences (Class 2 properties). Vacant land sales (Class 1) and sales of commercial, industrial and multi-family properties (Class 4) occur with much less frequency.

An average ratio is separately calculated for each of the three property classes. This ratio (a class ratio) is weighted, *i.e.*, it is determined by adding all the assessments, adding all the sale prices (not the number of sales) and dividing the former by the latter. Thus, it will be noted that the greater the sale price, the greater the weight ascribed to the sale in calculating the ratio.

The next step is to determine the aggregate (or equalized) true value of the properties in each class. This is accomplished by dividing the aggregate assessments in each class by the class ratio. The aggregate true values of all classes are then summed and divided into the aggregate assessments of all classes of properties to produce the weighted, classified ratio for the current year. Then that ratio is applied to the aggregate assessments to produce the aggregate (or equalized) true value for the current year.

Finally, the current years' true value is averaged with the prior years' true value, calculated in the same fashion. The aggregate assessments for the current year are then divided by the average true value for the current and prior years to produce the general average ratio promulgated by the Director for school aid distribution purposes. See *Gaynes v. Edison Tp.*, 2 *N.J. Tax* 500, 507–508, 432 *A.*2d 127 (App.Div.1980) (incorporating findings and conclusions of Tax Court).

The Director's ratio has performed yeoman service in several areas. It has been and is currently used to accomplish a fair, equitable and reasonable distribution of state school aid among New Jersey municipalities. *Atlantic City v. Atlantic County Bd. of Tax.*, 2 *N.J.Tax* 30 (Tax Ct.1980), aff'd 4 *N.J. Tax* 685 (App.Div.1982). The ratio has also been used by county boards

of taxation in allocating the costs of county government among county municipalities. *City of Passaic v. Passaic Co. Bd. of Taxation*, 18 *N.J.* 371, 113 *A.*2d 753 (1955). It has been used to determine the extent of and existence of assessment discrimination with respect to a particular parcel of real property. *In re Appeals of Kents 2124 Atlantic Ave. Inc.*, 34 *N.J.* 21, 166 *A.*2d 763 (1961). Finally, it has been incorporated in what is commonly referred to as chapter 123, the statutory remedy for assessment discrimination. *N.J.S.A.* 54:51A–6, *N.J.S.A.* 54:3–22. The Supreme Court has held that, absent severe or egregious circumstances, chapter 123 is the exclusive remedy for assessment discrimination. *Murnick v. Asbury Park*, 95 *N.J.* 452, 471 *A.*2d 1196 (1984).

The gravamen of plaintiffs' objections to the use of the Director's ratio appears to rest upon an immutable datum, *viz.*, that the district boundaries do not coincide with municipal boundaries. It is arbitrary, they say, to apply a ratio derived from sales throughout a municipality to ascertain the value of properties within the district, which is only part of the municipality. They allege, through their experts, that the characteristics of properties in the meadowlands district are substantially at variance with the municipality at large in terms of property class, type of property and number of sales, all of which leads to a conclusion that the Director's sales study does not produce representative data. In particular they object to the alleged distorting effect of the application of a ratio derived in large measure from sales of Class 2 residential properties to Class 4 properties, which, they claim, make up the large majority of properties in the meadowlands district and which have higher class ratios.

Significantly, they offer no alternative to the statutory method of measuring growth in ratables. An annual district-wide revaluation of properties in the meadowlands would be a burdensome expense to each municipality and, in all likelihood, would be viewed by North Bergen as particularly unjust, given that municipality's low percentage of total meadowlands acre-

age. Even if an annual revaluation were feasible, the task of estimating the base year (1970) market value of all ratables in the district within each municipality would be insurmountable.

In the field of taxation, great judicial deference has been accorded to legislative judgments concerning financing or taxing measures. *McKenney v. Byrne*, 82 *N.J.* 304, 412 *A.*2d 1041 (1980). Thus, where the legislature has established classifications for taxation purposes and provided for a particular allocation of tax revenues, courts have steadfastly upheld the taxation statutes if any conceivable state of facts affords a rational basis for the classification. *McKenney v. Byrne, supra* at 316, 412 *A.*2d 1041; *Taxpayers Ass'n of Weymouth Tp., Inc. v. Weymouth Tp.*, 80 *N.J.* 6, 39–40, 364 *A.*2d 1016 (1976), cert. den. sub nom. *Feldman v. Weymouth Tp.*, 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.*2d 373 (1977). Some discriminatory impact and some imperfections in the groupings or categories will not invalidate the classification. *Dandridge v. Williams*, 397 *U.S.* 471, 90 *S.Ct.* 1153, 25 *L.Ed.*2d 491 (1970).

Also, the tax-sharing formula applies the same standards to all municipalities. This is an important consideration in evaluating the reasonableness—and lack of arbitrariness—of the formula. *Willingboro Tp. v. Burlington Co. Bd. of Tax.*, 62 *N.J.* 203, 220, 300 *A.*2d 129 (1973); *McKenney v. Byrne, supra*, 82 *N.J.* at 317, 412 *A.*2d 1041.

Both plaintiff municipalities charge that the tax-sharing formula is unfairly applied to them. The Court notes, however, that a significant portion of the growth in ratables in Secaucus occurred within the meadowlands district in that municipality. For example, Hartz Mountain Associates, in 1970 and later years, constructed some nine million square feet of buildings devoted to light industrial and retail uses on 400 acres of land in the meadowlands portion of Secaucus. See *Apex Trucking v. Secaucus*, 1 *N.J. Tax* 417 (Tax Ct.1980).

It is North Bergen's misfortune to have only 6.76% of the total meadowlands acreage within its borders, and this fact

alone places North Bergen in the position of a net contributor to the intermunicipal account. North Bergen argues that the formula is unfairly applied to it. Unfair it may be; but unfairness is not necessarily equated with constitutional infirmity.

Plaintiffs' challenges to the Director's ratio are thus rejected.

■ Plaintiffs' final contentions are that the statutory powers of the HMDC have been preempted by the United States Environmental Protection Agency (USEPA) and the United States Army Corps of Engineers (USACOE). This development has occurred only since 1977, when the Clean Water Act, 33 *USC* § 1251 *et seq.*, was enacted by Congress, giving USEPA effective control over wetlands development.

Plaintiffs' argument, if supported by the evidence, is undergirded by well recognized legal principles. "Reason is the soul of law; the reason of the law being changed, the law is also changed ..." *Gangemi v. Berry*, 25 *N.J.* 1, 10, 134 *A.*2d 1 (1957). A statute valid when enacted may become invalid by a change in conditions to which it is applied. *Garden State Dairies of Vineland, Inc. v. Sills*, 53 *N.J.* 71, 75–76, 248 *A.*2d 427 (1968); *Hourigan v. North Bergen Tp.*, 113 *N.J.L.* 143, 151–152, 172 *A.* 193 (E. & A. 1934); 1 Sutherland, *Statutory Construction* (4th ed. 1985) § 2.06, *p.* 31.

It remains to be seen, then, whether the credible evidence warrants application of the legal principles just stated. I conclude that it does not.

The testimony of plaintiffs' experts leaves no doubt of the preemptive role of both USEPA and USACOE in the development of wetlands within the meadowlands district, *i.e.*, no wetlands development can take place without USEPA and USACOE approval, irrespective of approvals granted by HMDC. One of these experts, James Bach, a professional planner, opined that future development will not take place in the wetlands to any significant degree. As a consequence, he

continued, development of uplands within the district would be intensified.

The testimony of defendants' expert, Thomas Marturano, a professional engineer and planner, was most compelling. Mr. Marturano, the HMDC director of Solid Waste & Engineering, estimated the acreage of undeveloped uplands as in the thousands. He also opined that continued growth in the meadowlands district is not dependent upon developable wetlands. For example, he testified, there is a substantial demand for the redevelopment of old industrial sites in South Secaucus, North Bergen, Kearny and Jersey City and the conversion of those sites into higher and better uses. The Town of Kearny, it should be noted, contains 17.44% of the total meadowlands acreage, ranking second in meadowlands acreage behind Secaucus.[2]

Finally, the preemption of the statutory powers of HMDC concerning wetlands development by USEPA and USACOE is not as significant as plaintiffs would have us believe. There are approximately 20,000 acres in the meadowlands district. Of this acreage, about one-third, or 7,000 acres, are wetlands. Of the wetlands acreage 3,576 acres have been zoned for marshland preservation. In addition, there are acres of wetland soil contaminated with mercury. In fine, the expert concluded that no more than 800 acres of wetlands are realistically developable through the HMDC approval process, irrespective of the preemptive land use control of USEPA and USACOE.

For the reasons herein stated, plaintiffs' challenges to the validity of Article 9 of the Hackensack Meadowland Reclamation and Development Act are rejected.

Counsel for the HMDC will prepare and submit a form of judgment to be settled on notice pursuant to *R.* 4:42–1(c) (the five-day rule).

---

[2]The statutory powers of the HMDC extend to redevelopment. *N.J.S.A.* 13:17–6(j); *N.J.S.A.* 13:17–11(a)(4).