267 N.J. Super. 361 (1993)
631 A.2d 959
TOWN OF SECAUCUS, APPELLANT,
v.
HACKENSACK MEADOWLANDS DEVELOPMENT COMMISSION, BOROUGH OF CARLSTADT, BOROUGH OF LITTLE FERRY, TWP. OF SOUTH HACKENSACK, BOROUGH OF RUTHERFORD, BOROUGH OF EAST RUTHERFORD, BOROUGH OF RIDGEFIELD, TOWN OF KEARNY, CITY OF JERSEY CITY, BOROUGH OF NORTH ARLINGTON, BOROUGH OF MOONACHIE, TWP. OF LYNDHURST, TOWN OF NORTH BERGEN AND BOROUGH OF TETERBORO, RESPONDENTS. THE TOWNSHIP OF NORTH BERGEN, HUDSON COUNTY, NEW JERSEY, PLAINTIFF-APPELLANT,
v.
THE BOROUGH OF TETERBORO, BERGEN COUNTY, NEW JERSEY, BOROUGH OF RIDGEFIELD, BERGEN COUNTY, NEW JERSEY, THE TOWN OF KEARNY, HUDSON COUNTY, NEW JERSEY, AND THE HACKENSACK MEADOWLANDS DEVELOPMENT COMMISSION, DEFENDANTS-RESPONDENTS. TOWN OF SECAUCUS, PLAINTIFF-APPELLANT,
v.
HACKENSACK MEADOWLANDS DEVELOPMENT COMMISSION, BOROUGH OF CARLSTADT, BOROUGH OF EAST RUTHERFORD, CITY OF JERSEY CITY, TOWN OF KEARNY, BOROUGH OF LITTLE FERRY, TOWNSHIP OF LYNDHURST, TOWNSHIP OF MOONACHIE, BOROUGH OF NORTH ARLINGTON, TOWNSHIP OF NORTH BERGEN, BOROUGH OF RIDGEFIELD, BOROUGH OF RUTHERFORD, TOWNSHIP OF SOUTH HACKENSACK AND BOROUGH OF TETERBORO, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 15, 1993.
Decided August 18, 1993.
*366 Frances C. Holland argued the cause for appellant Town of Secaucus and plaintiff Township of North Bergen (Holland & Holland, attorneys; Ms. Holland, on the brief).
Marci D. Green, Deputy Attorney General, argued the cause for respondent Hackensack Meadowlands Development Commission (Robert J. Del Tufo, Attorney General, attorney; Joseph L. Yannotti, Assistant Attorney General, of counsel; Ms. Green, on the brief).
Bruce L. Humphreys argued the cause for respondent Borough of Ridgefield (Contant, Scherby & Atkins, attorneys; Mr. Humphreys, on the brief).
*367 Norman A. Doyle, Jr., filed a brief on behalf of Town of Kearny.
Porro and Porro, filed a brief on behalf of respondent, Borough of East Rutherford (Kenneth A. Porro, on the brief).
Respondents Borough of Carlstadt, Borough of Little Ferry, Township of South Hackensack, Borough of Rutherford, Borough of East Rutherford, City of Jersey City, Borough of North Arlington, Borough of Moonachie, Township of Lyndhurst, Town of North Bergen and Borough of Teterboro did not participate in appeal.
Presto & Barbire, filed a brief on behalf of respondent, Borough of Moonachie (Paul S. Barbire, on the brief).
Respondent, Borough of Teterboro, joins in the brief of respondent Hackensack Meadowlands Development Commission.
Respondents, Borough of Carlstadt, Borough of Little Ferry, Township of South Hackensack and Borough of Rutherford filed letters of nonparticipation.
Respondents, Borough of East Rutherford, Borough of Ridgefield, Town of Kearny, City of Jersey City, Borough of North Arlington, Township of Lyndhurst, and Town of North Bergen, did not participate in appeal.
Before Judges DREIER, SKILLMAN and VILLANUEVA.
The opinion of the court was delivered by SKILLMAN, J.A.D.
These three consolidated appeals present various challenges to the constitutionality and administrative interpretation of the intermunicipal tax-sharing provisions of Article 9 of the Hackensack *368 Meadowlands Reclamation and Development Act (the Act), N.J.S.A. 13:17-60 to -76.
The Act, enacted in 1969, created the Hackensack Meadowlands Development Commission (HMDC) as a regional governmental entity to oversee the orderly development of the Hackensack Meadowlands. The Act was intended to provide a means to reclaim, plan, develop and redevelop 21,000 acres of public and private land in the Meadowlands District (the District), consisting of salt water swamps, meadows and marshes, and related uplands. N.J.S.A. 13:17-1. The District encompasses parts of fourteen municipalities: Carlstadt, East Rutherford, Little Ferry, Lyndhurst, Moonachie, North Arlington, Ridgefield, Rutherford, South Hackensack, Teterboro, Jersey City, Kearny, North Bergen and Secaucus (the constituent municipalities). N.J.S.A. 13:17-3(j). Finding that development was slowed by the nature of the land and its distribution among many municipalities, the Legislature assigned responsibility to the HMDC to regulate development in the District with due regard to its special environmental needs. See N.J.S.A. 13:17-1. Accordingly, the HMDC was directed to prepare and administer a Master Plan that would supersede conflicting provisions of the constituent municipalities. N.J.S.A. 13:17-11(b).
Recognizing that regional development of the District would result in tax benefits to municipalities with land suited for commercial development while imposing tax burdens on municipalities whose land was best suited for residences or public use, the Legislature devised a tax-sharing mechanism, set forth in Article 9 of the Act, N.J.S.A. 13:17-60 to 13:17-76, to insure that no municipality would be singled out to reap the benefits or bear the burdens of this coordinated development. The intent of the tax sharing provision was to enable each constituent municipality to "equitably share in the new financial benefits and new costs resulting from the development of the meadowland district as a whole." N.J.S.A. 13:17-60(a).
*369 The tax-sharing provisions of the Act use the following terms of art:
(1) Adjustment year. The year for which the formula is being applied to determine amounts payable from a constituent municipality to the intermunicipal account or from the intermunicipal account to constituent municipalities. N.J.S.A. 13:17-61(a).
(2) Base year. Calendar year 1970. N.J.S.A. 13:17-61(e).
(3) Comparison year. The second calendar year preceding the adjustment year. N.J.S.A. 13:17-61(f).
(4) Aggregate true value. The assessed value of real property in a constituent municipality divided by the average assessment ratio promulgated by the Director of the Division of Taxation in the Department of the Treasury for school aid purposes (the Director's ratio) on October 1 of the year for which the value is to be determined. N.J.S.A. 13:17-67(a)(2).
(5) Apportionment rate. A rate determined by dividing the municipality's total property taxes levied for local, school, and veterans' and senior citizens' purposes in the comparison year by the aggregate true value of all taxable real property within the municipality, exclusive of Class II railroad property. N.J.S.A. 13:17-61(g).
(6) Intermunicipal account. An account established by the HMDC into which constituent municipalities pay obligations and from which constituent municipalities are paid amounts due to them for each adjustment year. N.J.S.A. 13:17-66.
A municipality's obligation to the intermunicipal account equals a percentage of the increase from the base year to the comparison year of the aggregate true value of taxable real property in the municipality's portion of the District, multiplied by the apportionment rate. N.J.S.A. 13:17-67(b). For 1983 through 1988, each municipality's obligation was 50% of the amount thus calculated. Ibid. Beginning in 1989, the percentage was reduced by 2% per year until 1993, after which it shall be 40% of the calculated amount. Ibid.
If the aggregate true value of District taxable real property within a municipality in any comparison year is less than that in the base year, the municipality is entitled to receive a "guarantee payment" from the intermunicipal account for the portion of the decrease in value that is attributable to acquisition of property by a governmental agency which resulted in the property becoming exempt from taxation, multiplied by the apportionment rate. N.J.S.A. 13:17-68. A municipality may also receive a payment *370 from the intermunicipal account for "school district services." N.J.S.A. 13:17-70. This payment is calculated by dividing the total local school tax levy for the comparison year by the total resident school enrollment and then multiplying that figure by the increase in resident enrollment in the District within that municipality between the base year and the comparison year. Ibid. If the "guarantee" and "school district services" payments to the constituent municipalities are less than the amounts payable into the intermunicipal account in any year, the balance is distributed among the constituent municipalities in the same ratio as the number of acres of District land within each municipality bears to total acres in the District as a whole. N.J.S.A. 13:17-72. The HMDC determines a municipality's tax sharing obligation by adding all payments due to a municipality from the intermunicipal account and subtracting therefrom the amount payable to the account by that municipality. N.J.S.A. 13:17-74(a).
Shortly after enactment of the Act, a number of lawsuits were filed challenging its constitutionality on a broad variety of grounds, which included claims that Article 9 constituted a private, special or local law relating to taxation, in violation of Article IV, section 7, paragraph 9(6) of the New Jersey Constitution, an improper delegation of the Legislature's taxing power, in violation of Article IV, section I, paragraph 1, and a tax for a regional rather than a local purpose, in violation of Article VIII, section I, paragraph 1(a). The trial court rejected all of these facial constitutional challenges to the validity of the Act. Meadowlands Regional Dev. Agency v. State of N.J., 112 N.J. Super. 89, 270 A.2d 418 (Ch.Div. 1970). The Supreme Court sustained the constitutionality of the Act substantially for the reasons expressed in the trial court opinion but supplemented that opinion with comments regarding the tax-sharing provisions, which had been amended during the pendency of the appeal. Meadowlands Regional Redevelopment Agency v. State of N.J., 63 N.J. 35, 304 A.2d 545, *371 appeal dismissed, 414 U.S. 991, 94 S.Ct. 343, 38 L.Ed.2d 230 (1973) (referred to hereinafter as Meadowlands). The Court concluded:
The amended tax-sharing provisions present a mechanism for sharing tax benefits and burdens within the District which on its face appears to be rational and fair to constituent municipalities. Experience with the formula will undoubtedly put it in better perspective and establish if, where and how changes are needed to accomplish its purposes. In any event, should a constituent municipality demonstrate that the tax-sharing provisions as actually applied to it work an arbitrary result, it will have the right to secure judicial relief. All we now decide is that the amended provisions have not been shown to be arbitrary on their face.
[Id. at 44-45, 304 A.2d 545.]
In March 1987 the Town of Secaucus (Secaucus) and the Township of North Bergen (North Bergen) filed separate lawsuits, which were subsequently consolidated, challenging the constitutionality of the tax-sharing provisions on various grounds. Their complaints sought a declaration that the tax-sharing provisions are invalid as applied and an injunction against their continued implementation in 1987 and thereafter. In the alternative, Secaucus sought a declaration of unconstitutionality of the "compounding effect," described in greater detail later in this opinion, under which a municipality's past payments into the intermunicipal tax-sharing fund were included in the calculation of its future obligations.
Secaucus also initiated two administrative proceedings challenging the HMDC's interpretation of certain sections of the Act governing the calculation of tax-sharing obligations. In February 1986 Secaucus petitioned the HMDC to review its staff's calculations of the constituent municipalities' 1986 tax-sharing obligations. Secaucus argued that the HMDC had (1) improperly included the "compounding effect" in its calculations, and (2) improperly failed to treat payments received by constituent municipalities under the Gross Receipts Tax Act (GRTA), N.J.S.A. 54:30A-49 to -68, as "payments in lieu of real property taxes" within the intent of N.J.S.A. 13:17-67(c). The HMDC initially dismissed Secaucus's petition on the ground that it was not authorized by N.J.S.A. 13:17-76. However, we reversed in an unreported opinion and remanded to the HMDC to consider the *372 merits of Secaucus's petition. Town of Secaucus v. Hackensack Meadowlands Dev. Comm'n, A-2874-86T7. After our remand, the matter was heard by an Administrative Law Judge (ALJ), who concluded that the HMDC's method of calculating tax-sharing obligations which resulted in the "compounding effect" was mandated by N.J.S.A. 13:17-61(g)(1). However, the ALJ also concluded that the HMDC erred in excluding payments to municipalities under the GRTA from its tax-sharing calculations.
On September 28, 1988, the HMDC adopted the ALJ's decision upholding the compounding effect, but rejected her conclusion that payments to municipalities under GRTA must be treated as payments in lieu of taxes. Secaucus's challenge to this administrative decision, originally filed in the Law Division, was subsequently transferred to this court pursuant to R. 1:13-4(a).[1]
On March 24, 1988, Secaucus appealed HMDC's calculations of tax-sharing obligations for 1985 through 1988, claiming that the HMDC had improperly disregarded the Port Authority's payments to Teterboro and Moonachie in lieu of real property taxes on Teterboro Airport. The ALJ agreed with this contention and ordered HMDC to recalculate the adjustment payments for 1985 and subsequent years by including the payments in lieu of taxes for Teterboro Airport. After receiving an extension of time from the Chief Administrative Law Judge, the HMDC issued a final decision which rejected the ALJ's recommended decision and concluded that it had properly excluded the payments in lieu of taxes relating to Teterboro Airport from its tax-sharing calculations. Secaucus also appealed this decision.
After hearing oral argument on Secaucus's appeal from the HMDC's first decision, this court issued an unreported opinion on *373 January 22, 1990, staying the appeals of both HMDC decisions until the trial court entered final judgment in the pending litigation challenging the constitutionality of the tax-sharing provisions. Town of Secaucus v. Hackensack Meadowlands Dev. Comm'n, A-2460-88T2; A-246-89T2. We also directed that the appeals from the HMDC's two decisions be consolidated with each other and with any appeal which might thereafter be filed in the suits challenging the constitutionality of the tax-sharing provisions.
During the pendency of this litigation, the Legislature amended the tax-sharing provisions by enactment of chapter 26 of the Laws of 1989. This amendment changed the tax-sharing provisions in a number of significant respects, including the elimination, as of January 1, 1989, of the "compounding effect."
The trial court rejected plaintiffs' constitutional challenges to the tax-sharing provisions. Township of North Bergen v. Borough of Teterboro, 254 N.J. Super. 704, 604 A.2d 216 (Law Div. 1991). The trial court held that plaintiffs' challenge to the compounding effect was barred under principles of res judicata by the Supreme Court's opinion in Meadowlands. The court also rejected plaintiffs' constitutional challenge to the provisions of Article 9 requiring the HMDC to use the "Director's ratio" in calculating the growth of property values in constituent municipalities. Id. at 716-21, 604 A.2d 216. In addition, the court rejected plaintiffs' argument that the HMDC's regulatory authority over development in the meadowlands has been effectively preempted by federal legislation enacted subsequent to the Act, thus negating the justification for the tax-sharing provisions upon which the Court relied in Meadowlands. Id. at 721-22, 604 A.2d 216. Plaintiffs' appeal from the judgment memorializing the trial court decision was consolidated with Secaucus's appeals from the HMDC's administrative decisions as directed in our earlier opinion.
We conclude that the trial court erred in ruling that plaintiffs' challenge to the constitutionality of the compounding effect is barred under principles of res judicata. However, rather than *374 remanding this part of the case, we have exercised our original jurisdiction and considered the merits of plaintiffs' challenge to the compounding effect. We conclude that the 1989 amendment of the tax-sharing provisions prospectively eliminating the compounding effect is constitutional. We also conclude that the trial court properly rejected plaintiffs' other challenges to the constitutionality of the tax-sharing provisions. In addition, we affirm the HMDC's decision that the State's payments under the GRTA are not payments in lieu of real estate taxes within the intent of N.J.S.A. 13:17-67(c), and the HMDC's decision, although not its reasoning, relating to the Port Authority's payments in lieu of real property taxes to Teterboro and Moonachie.

I
We first consider the trial court's ruling that plaintiffs' challenge to the constitutionality of the compounding effect is barred under principles of res judicata by the Court's decision in Meadowlands. Res judicata only "precludes parties from relitigating substantially the same cause of action." Culver v. Insurance Co. of N. Am., 115 N.J. 451, 460, 559 A.2d 400 (1989). Therefore, if subsequent events materially alter the facts underlying a judgment, a party is not precluded from pursuing fresh litigation. Washington Township v. Gould, 39 N.J. 527, 533, 189 A.2d 697 (1963). Moreover, there is a well recognized distinction in constitutional litigation between the constitutionality of legislation on its face and as applied. See State Farm Mutual Auto Ins. Co. v. State, 124 N.J. 32, 45-46, 590 A.2d 191 (1991). Consequently, a party who has unsuccessfully challenged the constitutionality of legislation facially may in light of subsequent events challenge its constitutionality as applied. Consistent with these principles, the Court in Meadowlands expressly preserved the right of parties such as plaintiffs to resurrect their challenges to Article 9 of the Act in light of actual experience with its operation, noting that "should a constituent municipality demonstrate that the tax-sharing provisions as actually applied to it work an arbitrary *375 result, it will have the right to secure judicial relief." 63 N.J. at 45, 304 A.2d 545.
Plaintiffs simply availed themselves of this right. Although the compounding effect flowed directly from the former language of the Act, this effect did not become evident to the HMDC or to the constituent municipalities until many years after the law was enacted. Consequently, the Court in Meadowlands did not decide any issue relating to the compounding effect. Moreover, plaintiffs could not reasonably have anticipated this consequence of the tax-sharing formula in the early years of its administration. Therefore, plaintiffs are not barred by res judicata from securing an adjudication of their claims relating to the compounding effect. See Culver v. Insurance Co. of N. Am., supra, 115 N.J. at 463, 559 A.2d 400.

II
The "compounding effect" derived from the former definition of the "apportionment rate" used to calculate a municipality's tax-sharing obligation. Before it was amended in 1989, N.J.S.A. 13:17-61(g) provided in pertinent part:
"Apportionment rate" means a rate determined as follows:
(1) The total property taxes levied for local, school, and veteran and senior citizens' purposes, as certified pursuant to R.S. 54:4-52, of the municipality in the comparison year, divided by
(2) The aggregate true value of all taxable real property, exclusive of Class II railroad property, located in the municipality, both within and without the district, in the comparison year, as determined by the Director of the Division of Taxation on October 1 of the comparison year,
....
[L. 1983, c. 36, § 2.]
Thus, if a municipality had been required to make an adjustment payment into the intermunicipal tax-sharing fund in a comparison year, the numerator used to determine the apportionment rate would be increased by the taxes levied to satisfy this obligation. Conversely, if a municipality had received an adjustment payment out of the intermunicipal tax-sharing fund in a comparison year, *376 the numerator used to determine its apportionment rate would be decreased by the reduced amount of taxes it had to levy in that year.
Before considering plaintiffs' constitutional attack upon the compounding effect, we first consider Secaucus's argument presented in its original petition to the HMDC, now repeated in its appeal from the HMDC's final decision, that the former version of Article 9 should be construed in a manner which avoids the compounding effect. Secaucus argues that the compounding effect "defeat[s] the legislative purpose of Article 9, which is to equitably apportion the benefits and burden[s] of new development." Thus, Secaucus urges us to construe N.J.S.A. 13:17-61(g), in its pre-1989 form, to exclude meadowlands adjustment payments in the determination of "apportionment rates."
However, the definition of "apportionment rate" before the 1989 amendment explicitly referred to "[t]he total property taxes levied for local, school, and veteran and senior citizens' purposes, as certified pursuant to R.S. 54:4-52," (emphasis added), which Secaucus concedes would include tax levies for the intermunicipal. fund. We are not free simply to disregard this clear statutory language to effectuate our understanding of underlying legislative intent. In addition, the HMDC had continuously interpreted Article 9 to require the inclusion of all tax levies for local purposes, including levies for payments into the intermunicipal fund, in the calculation of the apportionment rate for the comparison year. This "practical administrative construction" of Article 9 by the agency charged with its enforcement is entitled to "great weight." GE Solid State, Inc. v. Director, Div. of Taxation, 132 N.J. 298, 313, 625 A.2d 468 (1993).
Moreover, the history of the 1989 amendment to N.J.S.A. 13:17-61(g) demonstrates a legislative intent that this amendment be prospective only. Although the amendment, approved February 15, 1989, provided for its immediate application, retroactive to January 1, 1989, L. 1989, c. 26, § 6, the final form of the bill resulted from a Senate floor amendment, adopted January 12, *377 1989, which corrected an earlier form providing for a prospective January 1, 1989 effective date. The January 1, 1989 postponed effective date was selected "to effectuate a smooth transition of the law." Statement of Senate Independent Authorities Committee to Senate Bill No. 2226 (May 2, 1988). Thus, the Legislature always intended an effective date of January 1, 1989, even when that date constituted a postponed effective date. Postponement of a statute's effective date indicates that it is to have only prospective application. 2 Norman J. Singer, Sutherland Statutory Construction § 41.04 at 350 (Sands 4th ed. 1986 rev.). This legislative history reinforces the general presumption of prospective application of legislative enactments. Twiss v. State of N.J., 124 N.J. 461, 466, 591 A.2d 913 (1991). Thus, the Legislature made a deliberate decision to eliminate the compounding effect only prospectively, and unless this expression of legislative will violates the federal or state constitution, it must be enforced by this court.
Secaucus has not identified the specific constitutional provision upon which it relies in challenging the compounding effect. However, the Court in Meadowlands indicated that "judicial relief" would be available if the tax-sharing provisions were shown to "work an arbitrary result," 63 N.J. at 45, 304 A.2d 545, and Judge Conford's dissent stated that if such provisions are shown to be arbitrary, they will be held to be "special or local" legislation "relating to taxation" or "regulating the internal affairs of municipalities, in violation of Article IV, section VII, paragraphs 9(6) and (13) of the New Jersey Constitution. Id. at 47-49, 304 A.2d 545; see also Jersey City v. Zink, 133 N.J.L. 437, 447-48, 44 A.2d 825 (E. & A. 1945), cert. denied, 326 U.S. 797, 66 S.Ct. 493, 90 L.Ed. 485 (1946). We therefore assume that the constitutional provisions cited in Judge Conford's dissent are the basis for Secaucus's challenge to the compounding effect.
Secaucus's constitutional attack upon the compounding effect has been significantly altered by the enactment of chapter 26 of the Laws of 1989. As previously discussed, this amendment has eliminated the compounding effect, effective January 1, 1989. *378 Therefore, the question now is not whether the prior definition of the "apportionment rate" which produced the compounding effect would have been unconstitutional but rather whether the legislative decision to eliminate that effect only prospectively was so arbitrary that it must be found to be unconstitutional.
Our courts have long recognized that purely prospective relief is often appropriate in the field of government taxation and finance even when a statutory enactment is held to be unconstitutional. See, e.g., Salorio v. Glaser, 93 N.J. 447, 462-69, 461 A.2d 1100, cert. denied, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983); Robinson v. Cahill, 62 N.J. 473, 520-21, 303 A.2d 273, cert. denied sub. nom., Dickey v. Robinson, 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973); Borough of Neptune City v. Borough of Avon-by-the-Sea, 61 N.J. 296, 310-11, 294 A.2d 47 (1972). Courts are reluctant to grant retroactive relief in matters of public finance in recognition of the need for "[p]ublic fiscal stability." Salorio v. Glaser, supra, 93 N.J. at 465, 461 A.2d 1100. Governmental entities rely upon anticipated revenues in preparing their budgets and "in making appropriations and expenditures." Ibid.
The public interest in the fiscal stability of municipal governments supports the reasonableness of the legislative judgment that relief from the compounding effect should be granted only prospectively. For example, the compounding effect resulted in seven constituent municipalities receiving larger payments in 1987 than they otherwise would have received. These additional revenues were presumably taken into account by these municipalities' governing bodies in preparing their budgets. If the compounding effect had been eliminated retroactively, these municipalities would have had to raise taxes or reduce expenditures in subsequent fiscal years so that they could reimburse the intermunicipal account for whatever additional amounts they received in 1987 due to the compounding effect. To avoid this fiscal dislocation in recipient municipalities while relieving Secaucus and North Bergen of the burden of the compounding effect in future years, the Legislature eliminated the compounding effect only prospectively. *379 Since the compounding effect resulted in less than a 1.5% increase in Secaucus's budget for school and municipal purposes in the 1987 fiscal year[2] and actually resulted in a small decrease in North Bergen's budget for that year, we are satisfied that this legislative judgment was not arbitrary.[3]

III
We turn next to plaintiffs' challenge to the use of the "Director's ratio" in calculating constituent municipalities' tax-sharing obligations under Title 9. As stated earlier, the tax-sharing formula involves a determination of the increase in aggregate true value of taxable real property within a constituent municipality. This increase is determined by a comparison of aggregate valuations of land in the District in the base year, which was 1970, and in the comparison year. However, because assessment practices vary, the valuations of land in different municipalities cannot be accurately compared without adjustment. Consequently, through application of the Director's ratio, the property assessments of each constituent municipality in both the base and comparison years are equalized to their true values.
The trial court concisely described the calculation of the Director's ratio as follows:
The ratio is an expression of the percentage relationship between the assessment on a given property and its market value at a specific point in time, as reflected in sales occurring in the 12 months ended on June 30 immediately preceding such *380 point in time. In any given municipality in any given year (at least prior to the recent decline in values) the bulk of the sales from which the ratio is derived are of one to three family residences (Class 2 properties). Vacant land sales (Class 1) and sales of commercial, industrial and multi-family properties (Class 4) occur with much less frequency.
An average ratio is separately calculated for each of the three property classes. This ratio (a class ratio) is weighted, i.e., it is determined by adding all the assessments, adding all the sale prices (not the number of sales) and dividing the former by the latter. Thus, it will be noted that the greater the sale price, the greater the weight ascribed to the sale in calculating the ratio.
The next step is to determine the aggregate (or equalized) true value of the properties in each class. This is accomplished by dividing the aggregate assessments in each class by the class ratio. The aggregate true values of all classes are then summed and divided into the aggregate assessments of all classes of properties to produce the weighted, classified ratio for the current year. Then that ratio is applied to the aggregate assessments to produce the aggregate assessments to produce the aggregate (or equalized) true value for the current year.
Finally, the current years' true value is averaged with the prior years' true value, calculated in the same fashion. The aggregate assessments for the current year are then divided by the average true value for the current and prior years to produce the general average ratio promulgated by the Director for school aid distribution purposes.
[254 N.J. Super. at 717-18, 604 A.2d 216.]
The Act expressly requires the use of the Director's ratio in calculating tax-sharing obligations. N.J.S.A. 13:17-67(a)(2) provides:
(a) As used in this section, except as otherwise specifically provided:
....
(2) Aggregate true value of all taxable real property shall be determined by aggregating the assessed value of all real property within the District boundaries in each constituent municipality, and dividing said total by the average assessment ratio as promulgated by the Director of the Division of Taxation in the Department of the Treasury for State school aid purposes on October 1 of the respective years for which aggregate true value is to be determined, pursuant to P.L. 1954, c. 86, as amended, ...
Plaintiffs do not dispute that the Act mandates the use of the Director's ratio. Nor do plaintiffs contend that there is some other feasible method by which the true value of real property within each constituent municipality can be more accurately determined. Rather, plaintiffs' argument is that there is no sufficiently accurate method for determining the aggregate true value of real property within the District. Consequently, according to plaintiffs, *381 the tax-sharing formula is incurably arbitrary and must be declared unconstitutional.
The test of validity of the tax-sharing formula's use of the Director's ratio is not whether it is "mathematically perfect" but only whether it is "rational and fair." Meadowlands, supra, 63 N.J. at 46, 304 A.2d 545. As stated by the Court regarding related provisions, "any reasonable and efficient method of equalization may be used; ... mathematical exactitude is not required." Township of Willingboro v. Burlington County Bd. of Taxation, 62 N.J. 203, 220, 300 A.2d 129 (1973).
In rejecting plaintiffs' constitutional attack upon the tax-sharing formula's use of the Director's ratio, the trial court stated:
The Director's ratio has performed yeoman service in several areas. It has been and is currently used to accomplish a fair, equitable and reasonable distribution of state school aid among New Jersey municipalities. The ratio has also been used by county boards of taxation in allocating the costs of county government among county municipalities. It has been used to determine the extent of and existence of assessment discrimination with respect to a particular parcel of real property. Finally, it has been incorporated in what is commonly referred to as chapter 123, the statutory remedy for assessment discrimination. The Supreme Court has held that, absent severe or egregious circumstances, chapter 123 is the exclusive remedy for assessment discrimination.
The gravamen of plaintiffs' objections to the use of the Director's ratio appears to rest upon an immutable datum, viz., that the district boundaries do not coincide with municipal boundaries. It is arbitrary, they say, to apply a ratio derived from sales throughout a municipality to ascertain the value of properties within the district, which is only part of the municipality. They allege, through their experts, that the characteristics of properties in the meadowlands district are substantially at variance with the municipality at large in terms of property class, type of property and number of sales, all of which leads to a conclusion that the Director's sales study does not produce representative data. In particular they object to the alleged distorting effect of the application of a ratio derived in large measure from sales of Class 2 residential properties to Class 4 properties, which, they claim, make up the large majority of properties in the meadowlands district and which have higher class ratios.
Significantly, they offer no alternative to the statutory method of measuring growth in ratables. An annual district-wide revaluation of properties in the meadowlands would be a burdensome expense to each municipality and, in all likelihood, would be viewed by North Bergen as particularly unjust, given that municipality's low percentage of total meadowlands acreage. Even if an annual revaluation were feasible, the task of estimating the base year (1970) market value of all ratables in the district within each municipality would be insurmountable.

*382 In the field of taxation, great judicial deference has been accorded to legislative judgments concerning financing or taxing measures. Thus, where the legislature has established classifications for taxation purposes and provided for a particular allocation of tax revenues, courts have steadfastly upheld the taxation statutes if any conceivable state of facts affords a rational basis for the classification. Some discriminatory impact and some imperfections in the groupings or categories will not invalidate the classification.
Also, the tax-sharing formula applies the same standards to all municipalities. This is an important consideration in evaluating the reasonableness  and lack of arbitrariness  of the formula.
[254 N.J. Super. at 718-19, 604 A.2d 216 (citations omitted).]
We reject plaintiffs' constitutional attack upon Article 9 of the Act based on its utilization of the Director's ratio for substantially the reasons expressed by the trial court. We make the following additional observations.
Although, as discussed in section I of this opinion, the compounding effect was not noted by the Court in Meadowlands and apparently was not discerned by any of the parties, the problem with the use of the Director's ratio upon which plaintiffs rely was specifically noted in Judge Conford's dissenting opinion:
The act provides that the "aggregate true value" of real estate within the district boundaries of a municipality is to be fixed by application of the "average assessment ratio" promulgated by the Director of the Division of Taxation for state school purposes. Such ratios, however, are fixed for whole municipalities, not for any segment thereof. See Tp. of Willingboro v. Burlington Cty. Bd. Tax., 62 N.J. 203, 211-212 [300 A.2d 129] (1973).
....
Article 9 assumes that the Taxation Division Director's ratios for equalization of aggregate municipality-wide realty valuations are automatically usable for an arbitrarily selected segment of the municipality  as here the meadowland district portion of the municipality. This is an utterly unwarranted factual assumption, see Tp. of Willingboro v. Burlington Cty. Bd. Tax., supra, passim, and it further compounds the arbitrariness of the surcharge provisions of Article 9 in the other respects discussed herein.
[63 N.J. at 51 n. 4, 57, 304 A.2d 545.]
While the majority in Meadowlands did not discuss this part of the dissent, it presumably found this point unpersuasive.
We also note that plaintiffs' experts did not quantify any adverse impact upon plaintiffs from the use of the Director's ratio but instead expressed the opinion that it produces a distorted *383 estimate generally of the true value of real property within the District. The HMDC's Chief Fiscal Officer testified without contradiction that any distortion in the equalization process within the District resulting from use of the Director's ratio would be random and thus not directed at any particular constituent municipality. We add that appropriate judicial relief would be available if it were shown that a constituent municipality had manipulated its assessments of meadowlands properties to distort the calculation of its tax-sharing obligation.

IV
Plaintiffs argue that legislation enacted subsequent to passage of the Act and the Meadowlands decision sustaining its constitutionality has conferred broad regulatory authority upon the Army Corps of Engineers (USACOE) and United States Environmental Protection Agency (USEPA), see 33 U.S.C.A. §§ 1251(d), 1341-44, 1361; United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), thereby effectively superseding the HMDC's regulatory authority over development in the District. Consequently, plaintiffs argue that the Court's rationale for sustaining the tax-sharing provisions  "that the regional development of the district under the [HMDC] Master Plan will result in tax benefits to some areas within the district, as well as impose tax burdens or losses on other areas...." and thus it is fair "to have constituent municipalities share equitably in these benefits and burdens," 63 N.J. at 41, 304 A.2d 545,  is no longer valid.
The trial court rejected this argument:
The testimony of plaintiffs' experts leaves no doubt of the preemptive role of both USEPA and USACOE in the development of wetlands within the meadowlands district, i.e., no wetlands development can take place without USEPA and USACOE approval, irrespective of approvals granted by HMDC. One of these experts, James Bach, a professional planner, opined that future development will not take place in the wetlands to any significant degree. As a consequence, he continued, development of uplands within the district would be intensified.
The testimony of defendants' expert, Thomas Marturano, a professional engineer and planner, was most compelling. Mr. Marturano, the HMDC director of Solid *384 Waste & Engineering, estimated the acreage of undeveloped uplands as in the thousands. He also opined that continued growth in the meadowlands district is not dependent upon developable wetlands. For example, he testified, there is a substantial demand for the redevelopment of old industrial sites in South Secaucus, North Bergen, Kearny and Jersey City and the conversion of those sites into higher and better uses. The Town of Kearny, it should be noted, contains 17.44% of the total meadowlands acreage, ranking second in meadowlands acreage behind Secaucus.
Finally, the preemption of the statutory powers of HMDC concerning wetlands development by USEPA and USACOE is not as significant as plaintiffs would have us believe. There are approximately 20,000 acres in the meadowlands district. Of this acreage, about one-third, or 7,000 acres, are wetlands. Of the wetlands acreage 3,576 acres have been zoned for marshland preservation. In addition, there are acres of wetland soil contaminated with mercury. In fine, the expert concluded that no more than 800 acres of wetlands are realistically developable through the HMDC approval process, irrespective of the preemptive land use control of USEPA and USACOE.
[254 N.J. Super. at 721-22, 604 A.2d 216.]
Substantially for the reasons expressed by the trial court, we reject plaintiffs' argument that federal agencies have assumed general regulatory authority over the District and that the rationale under which the Court in Meadowlands sustained the validity of the tax-sharing provisions is no longer valid. In addition, we note that the HMDC has had regional planning authority over the District for more than two decades and that substantial development has already occurred under the HMDC's land use plan. Therefore, even if federal agencies had now assumed preemptive regulatory authority over a substantial part of the District, tax-sharing would still be required to balance the benefits and burdens resulting from the HMDC's past exercise of comprehensive regional planning authority.

V
Plaintiffs argue that a payment to a constituent municipality pursuant to the Gross Receipts Tax Act (GRTA) should be treated as a "payment in lieu of real estate taxes" within the intent of N.J.S.A. 13:17-67(c) in calculating tax-sharing obligations. This statute provides:

*385 If, during any comparison year, a constituent municipality has received a payment in lieu of real estate taxes on property located within the district, then, for the purpose of calculating the increase or decrease in the municipality's aggregate true value under subsection (a)(1) of this section, there shall be added to the aggregate true value otherwise determined for such comparison year an amount determined by dividing the amount of said in lieu payment by the municipal tax rate for the comparison year and dividing the result by the average assessment ratio for school aid purposes as promulgated by the Director of the Division of Taxation, ... (Emphasis added.)
Thus, payments in lieu of taxes are capitalized to create an assumed value, which is then added to aggregate assessed value. This must be done because there is no actual ratable on the tax rolls when a municipality receives an in lieu payment.
The Act contains no definition of the term "payment in lieu of real estate taxes." However, this term and similar terms are used in other legislation to refer to payments to municipalities in lieu of real property taxes on tax exempt property. See, e.g., N.J.S.A. 54:4-2.2a to -2.2k; N.J.S.A. 40A:20-12(b); N.J.S.A. 5:10-18(b).
The GRTA subjects public utilities to a state tax upon their gross receipts. N.J.S.A. 54:30A-54. The GRTA also provides that a municipality may impose real property taxes upon a public utility's "lands and buildings." N.J.S.A. 54:30A-52; N.J.S.A. 54:30A-50(b). However, a public utility's personal property affixed to the land, such as machinery and equipment used in the generation and transmission of gas and electricity, is exempt from real property taxation. N.J.S.A. 54:30A-52. At the same time, the GRTA provides for the payment of a portion of the revenue derived from the gross receipts tax to the municipalities in which public utility facilities are located. N.J.S.A. 54:30A-61. These payments are apportioned among municipalities based on the ratio of each public utility's "scheduled property" within a municipality to the total value of that public utility's "scheduled property" within the entire State. Ibid. "Scheduled property" is limited to specified kinds of public utility property, each of which is measured by a prescribed value. N.J.S.A. 54:30A-58.
In McKenney v. Byrne, 82 N.J. 304, 412 A.2d 1041 (1980), the Court rejected a claim that the part of the GRTA authorizing *386 payments to municipalities violates the Federal and State Equal Protection Clauses and provisions of the New Jersey Constitution prohibiting the enactment of special legislation, U.S. Const. amend. 14; N.J. Const., Art. I, ¶ 1; N.J. Const., Art. IV, § 7, ¶ 9(6) and (13), because the apportionment of funds thereunder is disproportionate and inequitable. In the course of its opinion the Court noted that the original version of the GRTA stated that "the gross receipts tax was `in lieu of all ... local taxation of all personal property....' R.S. 54:32-1." McKenney v. Byrne, supra, 82 N.J. at 317-18, 412 A.2d 1041. However, later amendments omitted the "in lieu of ... local taxation of personal property" language. Id. at 318, 412 A.2d 1041. In view of this legislative history, the Court stated:
We may not assume that the intent of the Legislature to provide revenues in lieu of local personal property taxes was the sole purpose of the Legislature....
There are additional conceivable rationales for the allocation scheme. It is contended that the statute compensates those municipalities where major utility electric and gas plants are situated. A real estate appraiser in an uncontradicted affidavit produced on the motion for summary judgment stated that the value of land is lowered if located near an electric switching station. The reasons he ascribed were that: (a) people fear a danger of possible accidents resulting from a mishap in the station; (b) a station mars the landscape and tends to be an eyesore; and (c) the general public thinks the station will interfere with radio and television reception. Further, increased fire and police protection may be necessary because of the existence within a municipality of utility installations such as gas plants or holders, or electric generating, including nuclear, facilities. The presence of these facilities may generate other environmental problems such as heavy traffic, road wear, noise and air pollution. All these elements support the concept that the presence of substantial amounts of scheduled property within a municipality's borders may justify some measure of greater compensation.
[Id. at 318-19, 412 A.2d 1041.]
The Court also noted that due to inflation and the increased price of oil, "the amount being paid to municipalities which have substantial scheduled property within their borders is continuing to increase even though the scheduled property located in a particular community remains constant." Id. at 312, 412 A.2d 1041.
In Karcher v. Kean, 97 N.J. 483, 493-97, 479 A.2d 403 (1984), which sustained the Governor's line item veto of part of the state appropriation for payments to municipalities of revenues derived *387 from the gross receipts tax, the Court again considered the nature of these payments. The Court indicated that the GRTA provides "statutory authorization to make expenditures of state funds for state aid to municipalities," id. at 495, 479 A.2d 403, and that it provides "a formula for the distribution and apportionment of those revenues as state aid to eligible municipalities." Id. at 496, 479 A.2d 403.
The Court's analysis in McKenney and Karcher persuades us that while state aid payments to municipalities under the GRTA have some characteristics of payments in lieu of real property taxes, they are not true "in lieu" payments and thus N.J.S.A. 13:17-67(c) does not require those payments to be considered in calculating tax-sharing obligations. In contrast to a typical provision for "in lieu of" tax payments, which is included in legislation establishing a total exemption from local real property taxes, the GRTA only exempts specified property of a public utility, leaving the land, buildings and some personality subject to local taxation. Moreover, while most in lieu payments are significantly less than what a governmental agency or non-profit entity would be required to pay in local real property taxes, the payments to municipalities under the GRTA substantially exceed the taxes which would be collected on exempt utility property. Most significantly, as the Court indicated in McKenney, the payments under the GRTA do not simply "provide revenues in lieu of local property taxes," but also compensate for the public inconvenience and additional governmental expenses resulting from the presence of utility installations in a municipality. 82 N.J. at 318-19, 412 A.2d 1041. If the full amount of these payments were capitalized in determining tax-sharing obligations, municipalities in which major public utility facilities are located would be required to share state aid designed to off-set the inconvenience and additional public costs of those facilities with municipalities which do not share those inconveniences or costs. This is the apparent reason why the Legislature now characterizes GRTA payments as "state aid" rather than as payments "in lieu of local taxation of personal *388 property." See, e.g., L. 1993, c. 165; see Karcher v. Kean, supra, 97 N.J. at 493-97, 479 A.2d 403.
We recognize that perhaps the most equitable method of dealing with GRTA payments to constituent municipalities would be to require inclusion in the calculation of tax-sharing obligations of the portion of these payments equivalent to what a municipality would receive in real property taxes if the utility's property were not exempt but to allow the municipality to retain all GRTA payments in excess of that amount. However, the Act does not provide any authorization for such an allocation of GRTA payments; under N.J.S.A. 13:17-67(c), the full amount of any payment in lieu of local real estate taxes must be capitalized in calculating a municipality's tax-sharing obligation. The absence of any provision for determining what portion of GRTA payments should be considered in lieu of local property taxes reinforces our conclusion that the Legislature did not intend these payments to be taken into account in calculating a constituent municipality's tax-sharing obligations.
The treatment of GRTA payments as in lieu of tax payments within the intent of N.J.S.A. 13:17-67(c) also would present practical administrative problems. Under N.J.S.A. 13:17-67(c), a municipality's obligation to include an in lieu payment in the calculation of its tax-sharing obligation depends on whether the payment is for "property located within the district." Ordinarily, it can be easily determined whether a particular tax exempt property is located within or outside an area. However, the allocation of GRTA payments between a public utility's property located within and outside the District would be quite complicated. "Scheduled property" on which GRTA payments are apportioned among municipalities includes gas mains and telephone lines, which are valued at a specific amount "per foot," electric towers, transformers and poles, which are valued as a unit basis, and electric generating stations and water and sewer treatment facilities, which are valued on the basis of "rated capacity." Consequently, a time consuming accounting of utility property within each constituent *389 municipality would be required if GRTA payments were deemed to be encompassed by N.J.S.A. 13:17-67(c).[4] The omission from N.J.S.A. 13:17-67(c) of any procedure for obtaining this information is a further indication that the Legislature did not contemplate the inclusion of any portion of GRTA payments in the calculation of tax-sharing obligations.
Moreover, the HMDC has disregarded GRTA payments for more than twenty years in calculating the tax-sharing obligations of constituent municipalities. Such "practical administrative construction of a statute over a period of years without legislative interference will, under appropriate circumstances, be accorded great weight as evidence of its conformity with legislative intent." GE Solid State, Inc. v. Director, Div. of Taxation, supra, 132 N.J. at 313, 625 A.2d 468. As previously discussed, the Legislature amended Article 9 in 1989 to eliminate the compounding effect, to increase the taxes attributed to growth within the District which a constituent municipality is permitted to retain from 50% to 60% and to change the tax-sharing provisions in various other respects. L. 1989, c. 26, §§ 3, 4. The Legislature could have at the same time easily amended N.J.S.A. 13:17-67(c) to include GRTA payments if it disagreed with the HMDC's exclusion of these payments from its calculations of tax-sharing obligations. The Legislature's failure to amend N.J.S.A. 13:17-67(c) even after Secaucus challenged the HMDC's long-standing administrative construction gives this construction additional weight. Pringle v. New Jersey Dept. of Civil Service, 45 N.J. 329, 333, 212 A.2d 360 (1965).
Finally, we note that GRTA payments represent a very substantial portion of the revenues of some constituent municipalities, such as Ridgefield, Kearny and Jersey City. "The drastic fiscal effect" which would result from the sudden inclusion of GRTA payments in the calculation of these municipalities' tax-sharing *390 obligations "suggests the wisdom of leaving changes in the previous generally accepted construction of the act, if any are thought to be needed, to the Legislature." Public Service Elec. & Gas Co. v. Township of Woodbridge, 73 N.J. 474, 482, 375 A.2d 1165 (1977).

VI
Lastly, we consider Secaucus's appeal from the HMDC's decision that the Port Authority's payments in lieu of real estate taxes to Teterboro and Moonachie should be excluded from the calculation of tax-sharing obligations. The ALJ concluded in an initial decision issued on March 13, 1989 that these payments should have been included in the HMDC's calculations. After the Director of the Office of Administrative Law granted it a nunc pro tunc extension of time, the HMDC issued its final decision on August 9, 1989. Secaucus argues that the ALJ's initial decision was automatically approved pursuant to N.J.S.A. 52:14B-10(c) when the HMDC failed either to issue a final decision within 45 days of receipt of the ALJ's decision or to secure an extension of time, and thus the HMDC's subsequent decision had no legal effect.
N.J.S.A. 52:14B-10(c) provides in pertinent part:
The head of the agency, upon a review of the record submitted by the administrative law judge, shall adopt, reject or modify the recommended report and decision no later than 45 days after receipt of such recommendations. Unless the head of the agency modifies or rejects the report within such period, the decision of the administrative law judge shall be deemed adopted as the final decision of the head of the agency.... For good cause shown, upon certification by the director and the agency head, the time limits established herein may be subject to extension.
The Supreme Court has indicated that this "automatic approval mechanism should be applied with caution." King v. New Jersey Racing Comm'n, 103 N.J. 412, 422, 511 A.2d 615 (1986) (quoting Aurentz v. Planning Bd. of Township of Little Egg Harbor, 171 N.J. Super. 135, 142-43, 408 A.2d 140 (Law Div. 1979)). Following King, this court also has been hesitant to conclude that an ALJ's initial decision has been automatically approved as a result of an agency's failure to properly discharge its decision-making responsibilities. *391 See, e.g., Chapel v. Board of Trustees of Pub. Employees' Retirement Sys., 258 N.J. Super. 389, 396-99, 609 A.2d 1294 (App.Div. 1992); DiMaria v. Board of Trustees of Pub. Employees' Retirement Sys., 225 N.J. Super. 341, 345-49, 542 A.2d 498 (App. Div.), certif. denied, 113 N.J. 638, 552 A.2d 164 (1988); cf. Mastro v. Board of Trustees, Pub. Employees' Retirement Sys., 266 N.J. Super. 445, 630 A.2d 289 (App.Div. 1993).
N.J.S.A. 52:14B-10(c) expressly provides that the 45 day period for issuance of an agency's final decision may be extended "upon certification by the director and the agency head." The statute does not prohibit the grant of an extension of time after expiration of the 45 day period.
The regulations of the Office of Administrative Law authorize its Director to grant an extension of time after expiration of the statutory period in "emergency or other unforeseeable circumstances." N.J.A.C. 1:1-18.8 provides in pertinent part:
(a) Time limits for ... issuing a final decision may be extended for good cause.
(b) A request for extension of any time period must be submitted no later than the day on which that time period is to expire. This requirement may be waived only in case of emergency or other unforeseeable circumstances.
....
(e) If the agency head requests an extension of the time limit for filing a final decision, he or she shall sign and forward a proposed order to the Director of the Office of Administrative Law and serve copies on all parties. If the Director approves the request, he or she shall within 10 days of receipt of the proposed order sign and issue the order and cause it to be served on all parties.
Secaucus has not attacked the validity of these regulations and we assume their validity for the purpose of this appeal.
The Director of the Office of Administrative Law properly exercised her discretion under N.J.A.C. 1:1-18.8(b) in granting an extension of time for the HMDC to issue its final decision. The HMDC submitted a certification which indicated that an employee of the HMDC had negligently failed to apply for an extension. We have no need to decide whether the circumstances recited in that certification would have provided a sufficient basis for an extension of time because there were other unusual and unforeseeable circumstances which strongly support the Director's decision. *392 If the ALJ's final decision were deemed to have been automatically approved, Teterboro and Moonachie would suffer financial harm from inclusion of the Port Authority's in lieu payments in the calculation of their tax-sharing obligations without this decision first having been reviewed by the HMDC. Yet Teterboro and Moonachie had no more power than Secaucus to force the HMDC to issue a timely decision nor did these municipalities bear any responsibility for the HMDC's failure to make a timely application for an extension of time. Consequently, it would be manifestly unfair to Teterboro and Moonachie if the ALJ's decision were deemed automatically approved because the HMDC failed to perform its statutory responsibilities in a timely manner.

VII
As previously noted, N.J.S.A. 13:17-67(c) requires the capitalization of the amount of any "payment in lieu of real estate taxes on property located within the district" received by a constituent municipality "during any comparison year." The HMDC acknowledges that the Port Authority's payments to Teterboro and Moonachie are "in lieu of real estate taxes," but it nevertheless excluded them from the tax-sharing calculations because the Port Authority agreed to make those payments before the effective date of the Act.
We find no support for the HMDC's position in the language of N.J.S.A. 13:17-67(c). As the ALJ correctly noted:
The only requirement of Section 67(c) is that in lieu payments be received during a comparison year and that they be derived from real estate in the District. The statute does not limit reflection of such payments to those arising out of new development nor agreements effective subsequent to the date of the statute.
The ALJ's decision also is consistent with the Act's treatment of the aggregate true value of taxable property in a comparison year, which does not distinguish between enhanced value derived from new construction and enhanced value due simply to increased real estate values. N.J.S.A. 13:17-67(a).
*393 Our conclusion that N.J.S.A. 13:17-67(c) mandates the inclusion of the Port Authority's payments to Teterboro and Moonachie in the tax-sharing calculations relating to a "comparison year" requires us to decide whether those payments also should be included in the calculations relating to the "base year." Article 9 does not contain a provision comparable to N.J.S.A. 13:17-67(c) which expressly requires the capitalized value of payments in lieu of taxes received in the base year to be added to the aggregate true value of taxable property. Consequently, if Article 9 were construed literally, the aggregate true value of taxable real property in the comparison year would be increased by the capitalized value of payments in lieu of taxes, but the aggregate true value in the base year would be determined without considering these same payments. As a result, a municipality such as Moonachie which received in lieu payments when the Act was enacted would have its tax-sharing obligations artificially inflated by the capitalized value of those payments, even though there was no new development of tax exempt property or any increase in the amount of in lieu payments after the effective date of the Act. Such a result would be fundamentally inconsistent with "[t]he principle underlying the tax-sharing provisions of the Act," which is that "constituent municipalities [should] share equitably in [the tax] benefits and burdens" of "regional development of the district under the [HMDC's] Master Plan." Meadowlands, supra, 63 N.J. at 41, 304 A.2d 545.
Our courts have long accepted the principle that interpretations of statutes which "lead to absurd or unreasonable results are of course to be avoided." State v. Gill, 47 N.J. 441, 444, 221 A.2d 521 (1966). "The rule of strict construction cannot be allowed to defeat the apparent legislative design." Wright v. Vogt, 7 N.J. 1, 7, 80 A.2d 108 (1951). "A statute often speaks as plainly by inference, and by means of the purpose which underlies it, as in any other manner." Alexander v. New Jersey Power & Light Co., 21 N.J. 373, 379, 122 A.2d 339 (1956). Therefore, if necessary to carry out the evident legislative intent, even a "[s]tatutory interpretive *394 technique which causes the deletion and disregard of language is justifiable." County of Monmouth v. Wissell, 68 N.J. 35, 43, 342 A.2d 199 (1975).
Applying these principles, we conclude that payments in lieu of real estate taxes in the base year must be capitalized in the same manner as provided in N.J.S.A. 13:17-67(c) in order to effectuate the underlying legislative intent of Article 9 and to avoid an unreasonable application of the tax-sharing provisions.
The Port Authority's payments in lieu of taxes to Teterboro and Moonachie were the same in the base year as in the comparison years for 1985 through 1988. Consequently, the inclusion of these in lieu payments in the tax-sharing calculations for both the base year and comparison years for 1985-88, as we conclude should have been done, would lead to substantially the same result as their total exclusion from the calculations, as determined by the HMDC.[5] Since any difference in the capitalized value of these in lieu payments in the base and comparison years would be relatively small, an order requiring the recalculation of tax-sharing obligations for these years would impose an unwarranted administrative burden upon the HMDC and the constituent municipalities. Moreover, the Legislature has resolved the issue prospectively with respect to Teterboro, the municipality whose tax-sharing obligation was affected most significantly by exclusion of the Port Authority's in lieu payments from the HMDC's calculations, by completely excluding it from participation in the intermunicipal *395 fund in future years.[6] Therefore, while we disagree with the HMDC's reasoning regarding this issue, we affirm its decision.
Accordingly, we affirm the final decisions of the HMDC appealed under A-2460-88T2 and A-246-89T2 and also affirm the final judgment of the Law Division appealed under A-5430-90T2.
NOTES
[1] We do not pass on whether the HMDC is a state administrative agency whose decisions are directly reviewable by this court, because the parties have not briefed the issue. See Walsh Trucking Co. v. Hackensack Meadowlands Dist. Constr. Bd. of Appeals, 240 N.J. Super. 525, 528 n. 1, 573 A.2d 951 (App.Div. 1990).
[2] In 1987, the only year for which evidence was presented regarding the fiscal impact of the compounding effect, Secaucus's meadowlands adjustment payment would have been $290,480 less if the compounding effect had been eliminated. Secaucus's total tax levy for school and municipal purposes for that year was $19,780,097. New Jersey Department of the Treasury, Division of Taxation, Annual Report for the Fiscal Year 1987, at 300-01.
[3] We also note that chapter 26 of the Laws of 1989 increased the amount of taxes from increased ratables in the District which constituent municipalities may retain from 50% to 60% and eliminated Teterboro from participation in the intermunicipal tax-sharing provisions, L. 1989, c. 26, §§ 3, 4; N.J.S.A. 13:17-67(b); N.J.S.A. 13:17-67.1, both of which changes benefitted plaintiffs.
[4] This calculation could be further complicated by application of the "cap" on GRTA payments to certain municipalities imposed by N.J.S.A. 54:30A-61.1 or by a failure to include the full amount of GRTA payments in the Annual Appropriations Act. See Karcher v. Kean, supra.
[5] As the HMDC's Chief Fiscal Officer pointed out at the hearing before the ALJ, under N.J.S.A. 13:17-67(c) the assumed valuation of property for which in lieu payments are made is based on two factors, (1) the amount of the in lieu payments, and (2) the equalized municipal tax rate for the year. Although the in lieu payments from the Port Authority to Teterboro and Moonachie have remained the same, their equalized municipal tax rates presumably have varied somewhat from year to year, thus producing some change in the assumed valuation of the Teterboro Airport properties from the base year to the comparison years in question.
[6] The 1989 amendments to Article 9 contained a provision excluding any constituent municipality with a per capita equalized valuation in excess of $1,000,000. from participation in inter-municipal tax-sharing. N.J.S.A. 13:17-67.1; L. 1989, c. 26, § 4. Teterboro is the only municipality in the District which fits this description.